# FARMERS' LOAN AND TRUST COMPANY *v.* GALESBURG.

## APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

No. 887. Submitted January 9, 1890. — Decided January 27, 1890.

The city of Galesburg, Illinois, by an ordinance, granted to one Shelton, and his assigns, in May, 1883, a franchise for thirty years, to construct and maintain water works for supplying the city and its inhabitants with water for public and private uses, the city to pay a specified rent for fire hydrants, and a tariff being fixed for charges for water to consumers. In December, 1883, the water works were completed by a water company to which Shelton had assigned the franchise, and a test required by the ordinance was satisfactorily made, and the city, by a resolution, accepted the works. The water furnished by the company for nine months was unfit for domestic purposes. After November, 1884, the supply of water was inadequate for the protection of the city from fire, and its quality was no better than before. During eighteen months after December, 1883, the company had ample time to comply with the contract. The city, by a resolution passed June 1, 1885, repealed the ordinance, and then gave notice to the company that it claimed title to certain old water mains which it had conditionally agreed to sell to Shelton, and of

which the company had taken possession. The city then took possession of the old mains, and, in June, 1885, filed a bill in equity against the water company to set aside the contract contained in the ordinance and the agreement for the sale of the old mains. In August, 1883, the company executed a mortgage to a trustee on the franchise and works, to secure sundry bonds, which were sold to various purchasers in 1884 and 1885. The interest on them being in default, the trustee foreclosed the mortgage by a suit brought in November, 1885, and the property was bought by a committee of the bondholders, in November, 1886. In February, 1886, the trustee had been made a party to the suit of the city. After their purchase, the members of the committee were also made parties and they filed a cross-bill, praying for a decree for the amount due by the city for water rents, and for the restoration to them of the old mains, and for an injunction against the city from interfering with the operation of the works. After issue, proofs were taken; *Held,*

(1) The supply of water was not in compliance with the contract, in quantity or quality;

(2) The taking possession by the city of the old mains was necessary for the protection of the city from fire;

(3) The contract of the city for the sale of the old mains was conditional and was not executed;

(4) The city was not estopped, as against the bondholders, from refusing to pay the rent for the hydrants, which, by the mortgage, was to be applied to pay the interest on the bonds, or from having the contract cancelled;

(5) The obligation of Shelton and his assigns was a continuing one, and their right to the continued enjoyment of the consideration for it was dependent on their continuing to perform it;

(6) The bondholders were bound to take notice of the contents of the ordinance before purchasing their bonds, and purchased and held them subject to the continuing compliance of the company with the terms of the ordinance;

(7) In regard to the old mains, the lien of the mortgage was subject to the conditions of the agreement for the sale of them by the city to Shelton;

(8) A suit by the city for a specific performance of the contract, or one to recover damages for its non-performance, would be a wholly inadequate remedy in the case;

(9) A decree was proper annulling the ordinance and the agreement; dismissing the cross-bill; directing the city to pay into court, for the use of the cross-plaintiffs, $3000, as the value of the use of the water by the city from December, 1883, to June, 1885; and dividing the costs of the suit equally between the city and the cross-plaintiffs.

IN EQUITY. The case is stated in the opinion.

*Mr. Herbert B. Turner, Mr. David McClure* and *Mr. Arthur Ryerson* for appellants.

*Mr. Frederick A. Willoughby* for appellee.

MR. JUSTICE BLATCHFORD delivered the opinion of the court.

The city of Galesburg, Illinois, a municipal corporation, by an ordinance of its city council, passed May 12, 1883, and approved by its mayor May 17, 1883, entitled "An ordinance providing for a supply of water to the city of Galesburg and its inhabitants, authorizing Nathan Shelton or assigns to construct and maintain water works, securing protection to said works, contracting with said Nathan Shelton or assigns for a supply of water for public use, and giving said city an option to purchase said works," granted a franchise to Shelton and his successors or assigns, for thirty years from the passage of the ordinance, to construct and maintain, within and near the city, water works for supplying it and its inhabitants and those of the adjacent territory "with water for public and private uses, and to use the streets, alleys, sidewalks, public grounds, streams, and bridges of the City of Galesburg, within its present and future corporate limits, for placing, taking up and repairing mains, hydrants, and other structures and devices for the service of water."

Section 2 of the ordinance provided that there should be two pumping engines, having a specified capacity, a standpipe, and not less than eight miles of mains for the distribution of water, of a sufficient size to furnish all the water required for the wants of the city and its inhabitants, and limited the range in size of the mains. It also provided for a specified test of the mains at their place of manufacture, and for the character of the fire hydrants to be rented by the city, and that there should be a test of the capacity of the water works on their completion, when Shelton or his assigns should "cause to be thrown from any six hydrants six simultaneous streams, each through fifty feet of two-and-one-half inch hose and a one-inch nozzle, to a height of one hundred feet."

Section 4 provided that "the water supplied by said works shall be good, clear water, and the source of supply shall not be contaminated by the sewerage of said city."

Maximum rates for charges for water to consumers by Shelton or his assigns were specified.

Section 7 reserved to the city the right to purchase the water works, on certain conditions, at any time after the expiration of fifteen years from the passage and approval of the ordinance.

By section 8 it was provided that in consideration of the benefits which would be derived by the city and its inhabitants from the construction and operation of the water works, and in further consideration of the water supply thereby secured for public uses, and as the inducement to Shelton or his assigns to accept the provisions of the ordinance and contract and to enter upon the construction of the water works, the franchises thereby granted to and vested in Shelton or his assigns should remain in force and effect for thirty years from the passage of the ordinance; and that, for the same consideration and as the same inducement, the city thereby rented of Shelton or his assigns, for the uses thereinafter stated, eighty fire hydrants of the character thereinbefore described, for the term of thirty years from the passage of the ordinance, and agreed to locate them promptly along the lines of the first eight miles of mains within the city limits, under direction of the city council, as soon as Shelton or his assigns should have located the line of the mains under the direction of the city engineer. The city further agreed to pay rent for the eighty hydrants, to Shelton or his assigns, at the rate of $100 each per year, and to pay rent at the same rate for any additional fire hydrants, up to one hundred, directed by the city council to be erected, and certain specified rates for additional hydrants over one hundred, such rent to be paid in half-yearly instalments, in January and July of each year, beginning from the date when each of the hydrants should be in successful operation, and to continue during the thirty years, unless the city should sooner become the owner of the water works, provided that it should not be liable for any hydrant rents for such

time as the works should not be able to supply the required amount of water.

It was also provided, by section 13, that the ordinance should become binding, as a contract, upon the city, on the filing with the mayor of Shelton's written acceptance of its terms and conditions, and that, after such acceptance, the ordinance should constitute a contract, and should be the measure of the rights and liabilities of the city and of Shelton or his assigns.

On the 16th of May, 1883, Shelton and John C. Stewart, then mayor of the city, executed the following contract: "It is agreed that Nathan Shelton shall purchase of the city of Galesburg all the ten and six-inch water mains now laid in the streets of said city that he can use in the water works he proposes to build in said city, at the price that it will cost him to buy and lay new mains, less the depreciation in value of said pipes, which depreciation is to be determined by Mr. Shelton and the finance and water committee of the council of said city, and less the cost of relaying, recaulking and repairing said mains, should they have to be taken up, relaid, recaulked. or repaired, and less the cost of recutting for cross-connections, and the city agrees to sell to Mr. Shelton, in case he shall erect his proposed water works as above, and deduct the pay for the same from the first hydrant water works rent accruing from said city to said Shelton. This agreement for the sale of water mains does not include any mains that are imperfect. It is further agreed that said mains now in use shall not be disturbed further than shall be necessary to cut and make connections with said pipes, until the pipes are laid and ready for use in the adjacent streets."

On the 17th of May, 1883, the mayor signed the ordinance, and on the 19th of May, 1883, at the meeting of the city council, the following communication from Shelton was received and ordered to be filed: "Hon. John C. Stewart, mayor of the city of Galesburg: I hereby accept the terms and conditions of the ordinance of said city, entitled 'An ordinance providing for a supply of water to the city of Galesburg and its inhabitants, authorizing Nathan Shelton or assigns to

construct and maintain water works, securing protection to said works, contracting with said Nathan Shelton or assigns for a supply of water for public use, and giving said city the option to purchase said works,' passed by the city council of said city May 12th, 1883, to all intents and for the purposes as by the 13th section of said ordinance I am to do. Nathan Shelton." The contract between Shelton and the mayor for the purchase by Shelton of the water mains from the city was thereupon approved by the city council.

Shelton then organized a joint-stock corporation, under the general law of the State of Illinois, under the name of the Galesburg Water Company, with a capital stock of $150,000, of which stock Shelton owned the amount of $147,500. Shelton became its president, and on the 20th of July, 1883, by an instrument in writing, assigned to it all the franchises, rights, privileges, contracts and agreements granted to or made with him by the city by the aforesaid ordinance, and authorized the company to receive all rentals to become due from the city for fire hydrants pursuant to the ordinance, as well as all other profits which might accrue from the erection of water works thereunder.

On the 20th of June, 1885, the city of Galesburg filed a bill in equity against the Galesburg Water Company in the Circuit Court of Knox County, Illinois, making the following averments: Prior to the 30th of April, 1883, the city had established a system of water works for its protection from fire, and for that purpose had purchased and laid down water mains in certain specified streets, which mains were supplied with water for fire purposes by two manufacturing companies, each of which had its pumps and machinery for furnishing water connected with the mains. Such system was at that date in full operation and able at all times to supply ample protection for the city in case of fire. The ordinance before mentioned was passed and approved, the contract of May 16, 1883, was made, and the acceptance of the ordinance by Shelton was received and filed. The Galesburg Water Company was created and organized, and Shelton assigned to it his rights under the ordinance. The company erected engine-houses,

placed boilers and engines therein, erected a stand-pipe and sunk a well. On the 1st of December, 1883, the city received notice from Shelton of his assignment to the company of his rights under the ordinance, and also a like notice from the company, with a further notice that the hydrants were in successful operation and ready for use; and the city council thereupon ordered a test to be made of the water works on the 6th of December, 1883. On that day Shelton caused to be turned on six streams of water simultaneously, each through fifty feet of hose with a nozzle attached thereto, to a considerable height in the main street of the city. Afterwards, and on the same day, the city council passed the following resolution: "Whereas the water works have been completed according to contract, and the test required by the ordinance concerning water works, passed May 12, 1883, has this day been satisfactorily made by the Galesburg Water Company: Therefore, resolved, that the city accept said water works from said company." The company thereafter made various efforts to supply the city with water in the quantity and of the quality called for by the ordinance, but failed to do so, although full opportunity therefor was afforded by the city. The water furnished was filthy in character, polluted by drainage from slaughter-houses and other offal, stagnant and wholly unfit for use, unhealthy and dangerous to life. On the 1st of June, 1885, an ordinance was passed by the city council in the following terms: "Section 1. That the ordinance entitled 'An ordinance providing for a supply of water to the city of Galesburg and its inhabitants, authorizing Nathan Shelton, or assigns, to construct and maintain water works, securing protection to said works, contracting with said Nathan Shelton, or assigns, for a supply of water for public use, and giving said city an option to purchase said works,' passed May 12th, 1883, be, and hereby is, repealed. All rights and privileges therein granted or thereby permitted are null. This ordinance shall take effect and be in force from and after its passage." That ordinance was approved by the mayor on the 10th of June, 1885, and on the next day a copy of it was served on the company, with a notice that all privilege of purchasing the water mains be-

longing to the city was considered by the city to be at an end, and that it claimed the right and title to the mains.

The bill waived an answer on oath, and prayed for a decree that the contract contained in the ordinance of May 12, 1883, and the agreement of May 16, 1883, be set aside; that all rights conferred by the ordinance and contract upon Shelton, his assigns, or the company, be decreed to be annulled; and that all right to purchase the water mains from the city be cancelled.

The company answered the bill, setting up facts in justification of its acts and denying the right of the city to relief. The answer also set up that, on the 1st of August, 1883, the company executed to the Farmers' Loan and Trust Company of the city of New York, a New York corporation, a mortgage to that company, as trustee for the holders of one hundred and twenty-five bonds of the water company, each for $1000 bearing that date, the principal payable in thirty years, with semi-annual interest at the rate of six per cent per annum, covering all the water works, franchise, contract, machinery, mains, and appurtenances belonging to the water company; that the mortgage was duly recorded in the proper county; that the bonds were bought by parties on the faith of the mortgage and the acceptance of the works by the city, subsequently to such acceptance; that such mortgage was a valid and subsisting lien on the contract between the city and the water company; and that the Farmers' Loan and Trust Company and the bondholders were necessary parties to the suit.

Under a petition filed in the court February 12, 1886, by the Farmers' Loan and Trust Company, an order was made allowing it to be made a party; and on the 24th of February, 1886, it filed a petition for the removal of the cause into the Circuit Court of the United States for the Northern District of Illinois. The cause was removed and thereafter proceeded in the said Circuit Court.

On the 22d of April, 1886, the Farmers' Loan and Trust Company filed an answer to the bill, setting up, among other things, that the amount found to be due to the city for the water mains sold by it was duly fixed and settled between the

city and the water company, and the balance found ,due from
the water company was credited to the city upon its indebted-
ness to the water company for water rents under the ordinance,
and the mains were transferred to and taken possession of by
the water company, and operated by it as a part of its water
system.    It also set up that the property mortgaged to it by
the water company, to secure the bonds, included the fran-
chises and rights granted by the city to the water company
and covered by the ordinance passed May 12, 1883, and also
the water mains which had been bought by the water com-
pany from the city prior to the execution of the mortgage and
the bonds; that the holders of the bonds were ignorant of the
nature and quality of the water supply of the water works,
except as the same were represented to the bondholders by the
city and the water company at the time of the execution of
the mortgage and the sale of the bonds, and supposed, from
such representations, that the water supply was ample and that
the water works were satisfactory and in successful operation;
that, before the negotiation and sale of any of the bonds, the
purchasers of them were furnished with certified copies of the
ordinance and of all the resolutions of the common council
regarding the same, and with copies of the contracts and reso-
lutions between the city and Shelton and the water company
in regard to the purchase of the water mains, and with copies
of the acceptance and assignment by Shelton of all his rights
in the ordinance and mains to the water company ; that it was
represented to the bondholders by the city and its officials that
the ordinance constituted a valid and binding contract between
the city and the water company, according to its terms; and
that the company had become the owner of all the water mains;
that it was further represented to the bondholders, by the city
and its officials and by the water company, that that company
was in successful operation and furnishing water to the city
and its inhabitants under the terms of the ordinance; that, on
the faith of such representations and statements, the owners
of the bonds up to the amount of $125,000 purchased the,
same in good faith and for a valuable consideration, in and
about January, 1884 ; that the bonds were outstanding and

unpaid; that the water company had failed to pay the interest on the bonds, and it was in default, and the Farmers' Loan and Trust Company had filed a bill in the Circuit Court of the United States for the Northern District of Illinois against the water company, to foreclose the mortgage; that the city, in June, 1885, had forcibly taken possession of the water mains; that it had repudiated its liabilities under the ordinance and refused to pay the water rent under the same, whereby the mortgaged property was made almost valueless; that the city, by reason of such statements and representations, was estopped, as against the Farmers' Loan and Trust Company, from denying the validity of the ordinance or the sale of the water mains; that, by reason of the mortgage and the bonds secured under it, the Farmers' Loan and Trust Company had a valid lien upon the ordinance and franchise, and upon the water mains as well as all other property of the water company; and that it denied the right of the city to rescind the ordinance, to repudiate the sale of the water mains, and to have any of the relief claimed in the bill, as against the Farmers' Loan and Trust Company.

A replication was filed to his answer on the 3d of May, 1886, and on a petition filed November 29, 1886, by Hardin Parrish, Ephraim W. Bond and R. Dale Benson, to be made parties defendant, an order was that day entered making them parties and giving leave to them to file a cross-bill. On the same day they filed an answer to the bill, adopting all the statements of the answer of the Farmers' Loan and Trust Company, and also filed a supplemental and cross-bill against the city, two of them being citizens of Pennsylvania and one of them a citizen of Massachusetts.

That bill averred, among other things, as follows: A foreclosure suit by the Farmers' Loan and Trust Company was brought November 4, 1885, a decree of foreclosure and sale was made in it June 21, 1886, and thereunder all the rights, property and franchises of the water company were purchased by the plaintiffs for $100,000, and, after a confirmation of the sale by the court, a deed of the property was executed by the master to them, November 8, 1886, so that they became its

owners. They adopted, as a part of their supplemental and cross-bill, the answer of the Farmers' Loan and Trust Company to the bill filed by the city. Among the property sold to them under the foreclosure sale were the water mains which, when the mortgage was executed, were connected with and a part of the system of the water company and operated by it, the same having been before that time sold by the city to the water company. In June, 1885, the city took forcible possession of the water mains and cut and destroyed the connection of the same with the other mains of the water company, and took up and carried away the hydrants and faucets of the water company connected therewith, and entirely deprived that company of the use of the same, and had ever since retained possession thereof, and deprived the water company and the Farmers' Loan and Trust Company and the plaintiffs of the use and possession of them. Without such mains the property purchased by the plaintiffs is almost, if not entirely, valueless, and cannot be operated, because the connection of the water mains had been cut and destroyed and the hydrants removed, and thus the plaintiffs were prevented from using and operating any of the property so purchased by them, and from furnishing water to private consumers and also to the city. The plaintiffs are ready and willing to operate the works and furnish water to the city or to private consumers, and would do so were they not prevented by the acts of the city. It is the intention of the plaintiffs, and they have the right, to extend the operation of the water system of the city and the mains thereof so as to cover the entire limits of the city, and also to extend the base of water supply so as to furnish always an abundant supply of good water for the needs of the city and of the private consumers therein, and there is an abundant supply of good water accessible for the water works and procurable by the plaintiffs, which it is their intention and they are ready to procure and supply. There is a large amount of money owing to the plaintiffs from the city for water rents earned by the water company, or its receiver, up to the time of the purchase by the plaintiffs, the claims for which passed to the plaintiffs by virtue of the sale, and also on account

of the contract and water rents since the sale, and also on account of the acts of the city in cutting and destroying the water mains and taking possession of the same and preventing the plaintiffs from using them and from operating the water works.

The prayer of the supplemental and cross-bill, which waives an answer on oath, is that an accounting be had between the plaintiffs and the city to ascertain the amount due to the former; that a decree be made for its payment; and that the city restore to the plaintiffs the water mains, hydrants, faucets and other property, and be enjoined from interfering with the plaintiffs in the possession thereof and in connecting the water mains with any of the other water mains belonging to them, and from violating any of the provisions of the ordinance passed May 12, 1883, and from interfering with the plaintiffs in the use of any of the property so purchased by them, and from collecting the water rents, or extending the water mains through any of the streets of the city, or extending the source of supply for the water works.

The city, on the 21st of December, 1886, answered the supplemental and cross-bill, denying the right of the plaintiffs in it to relief. A replication was filed to the answer of Parrish and others, and the court, on the 2d of April, 1887, made an order referring the case to John I. Bennett as master, to take proofs and report the evidence with his findings and conclusions thereon.

Voluminous proofs were taken before a special examiner and also some before the master, and the case was argued before the latter. On the 13th of May, 1887, he filed his report. It stated that some of the water works bonds were sold at various times from the spring of 1884 to May, 1885, those bonds being represented in the litigation principally by the cross-plaintiffs Parrish, Bond and Benson. The master arrived at the following conclusions:

(1) The city had express authority by its charter to pass the ordinance of May 12, 1883, and to fix the rates of water rents for a period not exceeding thirty years; and it became binding on the city and on Shelton, and was duly assigned by the latter to the water company.

(2) In view of the provisions of the ordinance, that the object for which the franchise was granted was expressed to be "for supplying the said city and the inhabitants thereof and of the adjacent territory with water for public and private uses;" that "the works shall be increased in capacity as the growth of the city and its needs require;" that "there shall be not less than eight miles of mains for the distribution of water in said city, of a sufficient size to furnish all the water required for the wants of said city and its inhabitants;" that "the water supplied by said works shall be good, clear water, and the source of supply shall not be contaminated by the sewerage of said city;" that Shelton or his assigns "shall, with due diligence, increase the steam and furnish fire pressure so long as needed for the extinguishment of any fire;" it was manifest that the purpose of the ordinance was to furnish a fire protection to the city and its inhabitants, and to furnish water for other public uses, for the flushing of sewers, for the use of the city hall and its offices, for public schools, churches and public fountains, and also for the use of the inhabitants, upon rates fixed in the ordinance, for mechanical and domestic purposes.

(3) The contract of Shelton as to the quantity and quality of the water was in the nature of a condition precedent to a performance on the part of the city, except as to the opportunity to Shelton and his assigns to construct the works.

(4) The contract on the part of the city was a grant of the right to maintain the works for thirty years; the right to use the public property of the city in constructing or repairing the works; the right to collect maximum annual rates for water used for private purposes; an agreement to pay for the use of hydrants, of a defined number, a fixed rate per hydrant, as rent, for thirty years; and the right to adopt rules for the supply of water and to enforce their conditions when not contrary to law; such rights acquired by Shelton and his assigns being dependent upon performance by Shelton and his assigns of his agreements. There was added the mutual agreement that after the expiration of fifteen years the city might purchase the water works.

(5) The contract contained in the ordinance was an entire one, and was not executed by a partial performance or by a performance as to one of the several essential undertakings on the part of Shelton and his assigns; and they assumed all the risk of obtaining a water supply sufficient in quantity and quality to comply with their contract.

(6) Although the water company constructed the building, machinery for pumping, stand-pipe, and water mains and their attachments, within the time limited and in compliance with the terms of the ordinance, prior to December 6, 1883, it failed to furnish a water supply which complied with the requirements of the ordinance either in quantity or quality, either before or after the expiration of the limit prescribed in the contract for the construction and successful completion of the works. The details of this failure, as founded on the evidence, are given at length by the master, his conclusion being, that the fact is established that the waters furnished by the water company were never pure, clear waters, nor furnished in the required quantity, but were always more or less contaminated by substances injurious to health and comfort, and which would naturally be derived from the sources from which the water supply was shown to have been obtained. Therefore, waiving the legal effect which the resolution of December 6, 1883, might have had as an estoppel upon the city, the water company, at no time, either before or after the fifteen months following May 17, 1883, furnished water to the city and its inhabitants in the quantity and of the quality required by the ordinance, and at no time complied with the ordinance and the contract.

(7) The resolutions passed by the common council on the 6th of December, 1883, were an estoppel against the city to deny the facts alleged in those resolutions, and the city was bound to know that the water company might execute a mortgage upon its property and franchises to secure the bonds; and the council intended by the resolutions, so far as Shelton and the water company were concerned, to foreclose the question as to the amount of water mains which the latter had placed in the streets, the character of the struc-

tures which they had erected, the machinery which they had put in place, and generally the mechanical execution of the contract, and also the question that they had complied with the test provided in the ordinance, so far as related to throwing fire-streams of the number and character required; but the test provided for in the ordinance was merely a test of sufficiency for fire service, and was designed to determine the time when the water rents for the use of the hydrants should commence, and could not be a test as to the quantity of water capable of being supplied by the works every twenty-four hours, much less a test of the goodness and purity of the water. Whether or not the water company was able to furnish the required quantity of water every twenty-four hours, and whether or not its quality as to purity and goodness for domestic and other uses was in compliance with the ordinance, must rest upon facts as proved to exist. Moreover the estoppel, so far as it did exist, was not a continuing one. The obligation of the water company to furnish the quantity and quality of water required by the contract was a continuing obligation, and was not met once for all by a compliance with the fire test of December 6, 1883. The right of the company to enjoy the consideration of the contract was thereafter to depend upon its continuing to perform it. There was not and could not be, a final and absolute acceptance of the water works by the city, without regard to a future compliance on the part of the water company with the requirements of the contract. The case was not one of works constructed for the city and to become its property upon acceptance; and the acceptance related merely to the sufficiency of the structures for fire service at the time.

(8) The agreement in regard to the purchase from the city of the water mains, and the contract formed by the ordinance and its acceptance, must be considered as one contract and construed together, and the agreement in regard to the water mains did not constitute an absolute sale of them, except on the compliance on the part of Shelton and his assigns with the conditions contained in the agreement itself in regard to the water mains. The city was not at any time to be de-

prived of the fire service of which the mains were a part, and they were not to be disturbed until Shelton or the water company were able to connect their works with those mains and continue the efficiency of the service by the new works when in successful operation ; and the successful erection of those works and the accomplishment of the things required by the ordinance were a condition to the sale of the mains. The agreement as to the mains was therefore a conditional contract, and such delivery as was made under it was a conditional delivery. The city's mains were never disturbed in its streets, except to the extent of making connections with the mains subsequently laid by the water company and the attachment of some new hydrants. The valuation of the mains and the adoption of such valuation by the council amounted to no more than if their value had been stated at a definite sum in the agreement in regard to them. The letter of the mayor, written, in fact, after his term of office had expired, and antedated, stating that the mains had been delivered by the city to the water company, was of no effect ; and, even if it had been written by him during his term of office, it was simply the expression of a legal opinion, and was not within the line of his official duty, without a special authority from the council.

(9) After the passage of the ordinance of June 1, 1885, rescinding the contract between the city and the water company, the city forcibly disconnected its mains from the system of mains laid by the water company, and restored the system of fire protection which it had enjoyed before the water company constructed its works.

(10) The period within which the water company was required to complete its works and put them in successful operation expired in August, 1884. It failed to comply with its contract, and acknowledged that failure. It then resorted to the sinking of gang wells, which it completed in November, 1884 ; but they also failed as a source of supply. The city showed great patience and forbearance, and waited more than eight months after August, 1884, and then passed the repealing ordinance of June 1, 1885.

(11) The recaption of the mains, which were only conditionally in the possession of the water company under a conditional sale, and which conditions had not been complied with by Shelton and his assigns, was therefore rightful; and the water company can have no right to restitution, nor had it any legal right to a further extension of time, for further experiments in respect to a new source of water supply.

(12) As to the question whether the plaintiffs in the cross-suit are entitled to any relief which could not be granted to the water company, the effect of the decree, sale and deed in the foreclosure suit was to vest in the purchasers at the sale the equitable interest of the trustee and of the bondholders, and all the legal interest of the water company. Before the decree, the bill of foreclosure had been dismissed as against the city, and its interests were in no manner affected by the foreclosure. The foreclosure suit, having been initiated and brought to a conclusion while the present suit of the city against the water company was pending, was, as to this suit, a proceeding *pendente lite;* but the plaintiffs in the cross-suit stand as the representatives of the bondholders, and the equities of the latter should be considered in fixing the terms of the decree. The bondbonders, as between them and the water company, were *bona fide* purchasers of the bonds. The water company and its agents holding the bonds for sale in 1884 and 1885, prior to May 20th, 1885, represented that the works of the water company were in successful operation, and that it had complied, when the bonds were sold, with all the conditions of its contract with the city; and, the bonds being negotiable, there was no proof of any notice to any of their purchasers which would affect their validity. The bonds and the mortgage, however, were in no sense obligations of the city, nor was it a party to their issue; and it did not become in any manner responsible for any part of the debt created by the bonds. The letters written by the city engineer, the city attorney, the chairman of the water committee, the mayor of the city and perhaps other officers, cannot operate as an estoppel on the city, because they were not written in pursuance of direct authority and were not within the

official duty of those officers. They tend, however, to show the *bona fides* of the purchases made by the bondholders; and the plaintiffs in the cross-suit cannot have imputed to them the actual bad faith which may be inferred as against Shelton and the water company in regard to the construction of the works, the water supply and the management of the affairs of the water company. They can have, however, no greater right than the water company would have had, to be restored to the possession of the city's mains, and to be permitted by the city to further experiment in regard to securing a supply of water and complying with the contract.

(13) The city never paid any interest upon the bonds. The first payment of interest was made by the water company, and the fact of such payment was made known to some of the purchasers before they would purchase the bonds. The mortgage provided for the direct payment of hydrant rents to the trustee, to be applied in payment of interest; but no payment was ever thus made by the city to the trustee. That fact was known to the trustee, and, it being the agent of the bondholders, such knowledge was imputable to them.

The water company afterwards defaulted in the payment of interest, and the foreclosure proceedings were had upon the basis of a default made in the payment of interest due February 1, 1885. The bondholders knew or were chargeable with knowledge that there was a default in the payment of interest early in 1885 and a long time before June 1, 1885; and they also had knowledge of the existence of trouble between the city and the water company.

(14) There was a clause in the mortgage providing that if the water company should fail to perform any of its agreements contained in the mortgage it should be lawful for the trustee to take possession of the mortgaged property, and operate it as a mortgagee in possession, for the benefit of the bondholders, and during such possession to make all needful repairs and replacements in the mortgaged property, and to receive the rents and profits therefrom until foreclosure. This could have been done at least as early as February, 1885, when there was a default in the payment of interest. The trustee,

and the bondholders for whom it was acting, failed to take such possession; and the plaintiffs in the cross-suit are not entitled to the relief prayed in their cross-bill, while the city is entitled to have the ordinance of May 12, 1883, annulled.

(15) The decree cancelling the franchise ought not to be unconditional, however, but should be conditioned that the city, or some person or corporation authorized by it, should pay into court, for the use of the plaintiffs in the cross-suit, the reasonable cash value of the mains constructed by the water company, the machinery, the stand-pipe, the engine-house, the land on which the same are located, and perhaps other property, to be ascertained by a master, and also an equitable amount in satisfaction of water rents.

The city excepted to this report, and the trustee also excepted to it. The case was heard before Judge Gresham, and his opinion is reported in 34 Fed. Rep. 675. He concurred generally with the master in his views of the case, and said: "The purchasers of the bonds knew that, unless water was furnished in quantity and quality as called for by the contract, nothing would be due from the city for water rents. A different ruling would be equivalent to holding that by adopting the resolution of December 6, 1883, the city guaranteed the payment of interest which would thereafter accrue on the bonds. The city did nothing of the kind, nor is it believed that the purchasers of the bonds invested their money believing that this resolution amounted to such guaranty. By the trust deed or mortgage the Farmers' Loan and Trust Company and the bondholders succeeded to the rights of the water company. If this were a suit between the city and the water-works company I should grant the relief prayed for without allowing anything for water furnished, for none was furnished in compliance with the contract. But the controversy now is between the city and persons representing the bondholders, and I think it equitable that the city should pay them a reasonable compensation for the water which was furnished up to the time it resumed possession of the old mains. I do not think the bondholders' committee is entitled to the old mains. They were not sold to Shelton unconditionally and absolutely.

They were sold to him to be used in a particular way and for a particular purpose, and to be paid for by water furnished under the terms of the contract. Shelton and his successor, the water company, having failed to comply with the contract, although afforded ample time to do so, the city was authorized to resume possession of its old mains and protect its inhabitants as best it could against fire."

On the 2d of May, 1888, the court entered a decree adjudging that the contracts granting the franchise to Shelton and his assigns and providing for the sale of the water mains, and the ordinance of May 12, 1883, and all rights, franchises and privileges granted thereunder, were annulled and cancelled, and the property in the water mains was revested and confirmed in the city; dismissing the supplemental and cross-bill of Parrish, Bond and Benson; ordering the city to pay to them a reasonable sum for water used from December 1, 1883, to June 1, 1885, and referring it to a master to ascertain such sum; and dividing the costs of the suit equally between the city and the plaintiffs in the cross-suit. The Farmers' Loan and Trust Company and the plaintiffs in the cross-suit prayed an appeal to this court from that decree.

The master, on the 13th of June, 1888, reported the sum to be paid, as the value of the use of the water, at $3000. The plaintiffs in the cross-suit excepted to this report, and on the 13th of June, 1888, the court overruled their exceptions, confirmed the report, and directed the city to pay into court for the use of the plaintiffs in the cross-suit the sum of $3000. From that decree, and from the prior decree of May 2, 1888, the plaintiffs in the cross-suit and the Farmers' Loan and Trust Company prayed an appeal to this court.

The appellants urge that the Circuit Court erred (1) in not dismissing the bill for want of equity, because the conditions of the contract were conditions subsequent; (2) in not holding that the city was estopped by the resolution of December 6, 1883; (3) in not dismissing the bill on the merits, on the ground that the water company was not in default; (4) in holding that the city had a right to repossess itself of the old mains which it had sold to Shelton and through him to the

water company; (5) in not granting the prayer of the cross-bill; and (6) in not sustaining the exceptions of the appellants to the first report of the master, and particularly those to his findings respecting the nature and scope of the contract.

It is quite clear, on the proofs, that the water furnished by the water company for the period of about nine months during which its works were operated was unfit for domestic purposes; that the course of the city was entirely forbearing and generous towards the water company; and that after the gang wells were completed in November, 1884, the supply of water was inadequate for the protection of the city from fire, and its quality was but little better than it was before the construction of the gang wells. After they were constructed the water distributed to the customers of the company was surface water mixed with water from the gang wells. The company was at no time able to furnish even bad water in the quantity required by the contract, or needed by the city for fire protection or for flushing the sewers. During the eighteen months which elapsed after the completion of the works, the company had ample time to comply with the contract, and the city was under no obligation to give it further time to experiment. The taking possession by the city of the old water mains, after the passage of the resolution of June 1, 1885, was necessary for the protection of the city from fire. It could not continue, after annulling the contract, to receive from the water company water for fire purposes. The contract for the sale of the old mains was a part of the contract with the city in relation to the water works. The two agreements constituted one contract. The contract for the sale was merely a contract to sell, and not an executed contract of sale. The delivery of the old water mains was conditional, and made for a special purpose; and, the conditions not having been performed, no title to them passed either to the water company or to the trustee under the mortgage, and the recaption of them by the city was lawful. By the contract for their purchase, both what mains were to be purchased and the price to be paid for them remained to be determined, and so the agreement was executory. It was also by its terms con-

ditional; and the delivery, too, was conditional, for a specific purpose, and without any intention that the city should, by the making of the agreement, part with its title to the mains.

In regard to the rights of the bondholders, although the purchasers of the bonds may have been influenced to purchase them by the terms of the resolution of December 6, 1883, and by the letters from the officers and citizens of the city introduced in evidence, the city was not thereby estopped from refusing to pay the rental for the hydrants, which by the terms of the mortgage was to be applied in payment of the interest on the bonds, or from having the contract cancelled. Although the bondholders exercised good faith in purchasing the bonds, they bought them knowing that the city was not a party to them, and that the payment of water rents by the city for the hydrants depended upon a continued compliance by the water company with the terms of the contract. The letters of the private citizens could not affect the city; and the letters from the officers of the city could not affect its rights, because they were not written by its authority or within the scope of their powers as its officers.

The scope of the resolution of December 6, 1883, accepting the works, extended only to the fact that the provisions of the ordinance respecting their construction had been complied with and the test required by the ordinance had been satisfactorily made. It covered only the physical existence and condition of the artificial structures. The contract extended, however, to the amount of water which the works should be able actually and permanently to supply, and the character of the water to be supplied, all of which was uncertain, and the risk of which was assumed by Shelton and his assigns, their obligation being a continuing obligation, and their right to the continued enjoyment of the consideration for it being dependent upon their continuing to perform it. There was in the resolution of December 6, 1883, no guaranty that the water company could or would in the future comply with its contract. The liability of the city to pay in future the hydrant rents depended upon the future compliance of the water company with its contract; and in case of its failure the city would

have the right to ask for the rescission of the contract. This the bondholders knew when they purchased the bonds. The city entered into no contract with them, and the passage of the resolution of December 6, 1883, could not deprive the city of the relief to which it would otherwise be entitled, on the failure of the water company to comply with its contract. The provisions of the ordinance requiring the water company to furnish the amount of water called for by it, and that the water supplied by the works should be good, clear water, and the source of supply not be contaminated by the sewerage of the city, were known to the bondholders when they purchased the bonds, and they also knew that the payment of the hydrant rents which would go to pay the interest on the bonds must depend upon the furnishing of water by the water company according to the contract.

Nor could the test required by the ordinance and satisfactorily made by the water company be a test of anything but the pressure power of the works. It could not be a test of the quantity of water which would thereafter be supplied by the works, nor of its continuing quality for domestic purposes. The resolution of acceptance cannot be considered as a guaranty to the bondholders that the water company would thereafter perform its contract for furnishing water in the quantity and of the quality called for by the ordinance. The bondholders were bound to take notice of the contents of the ordinance before purchasing their bonds, and purchased and held them subject to the continuing compliance of the water company with the terms of the ordinance. They bought the bonds as obligations of the water company, and not as evidences of indebtedness of the city; and they had information from the ordinance that the city would not be liable for hydrant rents if the water company failed to furnish water as agreed, and that if the water company neglected to comply with its contract the city would have the right to invoke the aid of a court of equity to enforce a cancellation of the contract.

As to the old water mains, the trustee and the bondholders took the lien of the mortgage subject to the conditions of the agreement for the sale of them by the city to Shelton. Imme-

diately after the passage of the rescinding resolution of June 1, 1885, the city proceeded to resume possession of the old mains, and its bill against the water company was filed immediately thereafter, and on the 20th of June, 1885. The water company never credited the city with any money due on account of rent for the hydrants, applying it as payment on account of the old water mains; nor did the city ever apply any money due by it to the water company for hydrant rents towards paying itself for the old mains.

The principal contention on the part of the appellants is that, on the acceptance of the ordinance by Shelton, a right in the franchise vested in him, which could not be defeated even though he afterwards failed to comply with its terms; that the failure of the water company to furnish water in the quantity and of the quality called for by the ordinance was only a breach of a condition subsequent; and that a court of equity will not lend its aid to divest an estate for such a breach. But it seems to us that in respect to a contract of the character of the present one, the ability of the water company to continue to furnish water according to the terms of the ordinance was a condition precedent to the continuing right of Shelton and his assigns to use the streets of the city and to furnish water for a period of thirty years; and that when, after a reasonable time, Shelton and his assigns had failed to comply with the condition as to the quantity and quality of the water, the city had a right to treat the contract as terminated, and to invoke the aid of a court of equity to enforce its rescission. A suit for a specific performance of the contract, or a suit to recover damages for its non-performance, would be a wholly inadequate remedy in a case like the present. The danger to the health and lives of the inhabitants of the city from impure water, and the continued exposure of the property in the city to destruction by fire from an inadequate supply of water, were public questions peculiarly under the care of the municipality; and it was entitled and bound to act with the highest regard for the public interests, and at the same time, as it did, with due consideration for the rights of the other parties to the contract.

We see no error in the decree of the Circuit Court, and it is

*Affirmed.*