THE CITY OF GRAND HAVEN v. THE GRAND HAVEN WATERWORKS.

*Equity jurisdiction—Rescission of contract—Municipal corporations—Construction of waterworks—Refusal to accept.*

1. The equity court has jurisdiction to decree the rescission of a contract for non-performance.

2. Complainant filed a bill for the rescission of a contract for the construction of waterworks and the furnishing of water for fire and domestic purposes, on the ground of the failure of the contractor to furnish the quality of water and the pressure power contracted for. And it is held that the bill states a case for equitable cognizance, and that the proofs abundantly show that the city council was justified in its refusal to accept the works at the time they were tested, and that at no time since has the defendant been in a position to comply with its agreement, so that it could insist upon such acceptance.

Appeal from Ottawa. (Judkins, J., presiding.) Argued November 22, 1893. Decided February 20, 1894.

Bill for the rescission of a contract. Complainant appeals. Decree reversed, and prayer of complainant granted. The facts are stated in the opinion.

*Walter I. Lillie (George A. Farr,* of counsel), for complainant.

*Andrew Howell (George W. McBride,* of counsel), for defendant.

LONG, J. The defendant is a corporation organized under the provisions of chapter 84, How. Stat.

On April 1, 1883, the city of Grand Haven owned a small system of waterworks, consisting of a pump house, pumps, wells, and from one-half to three-quarters of a mile of wooden piping. These works were inadequate for

supplying the city and its inhabitants with water for fire and domestic purposes, and a more extensive system was thought to be needed; and on April 12, 1883, the following resolution was passed by the council, pursuant to the provisions of section 3110 (chap. 84, § 1), How. Stat.:

"*Resolved*, that it is expedient to have constructed waterworks for the purpose of supplying the city of Grand Haven and the inhabitants thereof with water for fire, domestic, and other purposes, but that it is inexpedient for the city of Grand Haven, under the power granted in the charter, to build such works."

In September, 1883, S. L. Wiley, for the S. L. Wiley Construction Company, of Greenfield, Mass., presented to the city a proposition to put in waterworks. Among other things, the proposition contained the following:

" We will, if granted a franchise, organize a company in accordance with the requirements of your State statutes, and do all that may be necessary to be done in such cases under your charter and laws.

" We will locate and establish a good and sufficient water supply for fire, mechanical, manufacturing, and domestic purposes; and said water shall not be deleterious to the health of those who may use it.

" The source of water supply shall be from such point or place as shall best subserve the joint interest of the city of Grand Haven and the company, but it shall at all times be ample for the purposes contemplated.

" We will establish wells of sufficient capacity, either open or driven, and construct all needful filters or infiltration galleries.      *     *     *     *     *     *     *     *

" We will furnish and set a system of pumping engines that shall be modern, capable, endurable, and sufficiently massive, and duplicate, with a combined capacity of one and one-half millions of gallons of water in every 24 hours.   *   *   *

" The pressure power of the pumping engines shall be sufficient and equivalent to throw six one-inch streams to a perpendicular height of 100 feet, simultaneously, from hydrants situated upon the line of piping system at any different points in the city, high or low levels, mutually agreed upon.      *     *     *     *     *     *     *     *

" For the safety of the city, and to always guard against

the destruction of property, we guarantee a fire pressure at all times almost instantaneously, at least within five minutes after an alarm shall have been given at the pumping station," etc.

The proposition also recited that the city should have free use of water for public school buildings, and for many other purposes, and for which the city should:

"1. Grant a franchise to the Grand Haven Waterworks, a corporation to be hereafter organized, to lay mains and pipes for the conveying and distribution of water throughout the city of Grand Haven, this franchise to be for the period of 25 years.

" 2. Pass such ordinances as will protect the machinery, buildings, etc., of the company from injury or destruction by evil and malicious persons, and such other ordinances· as will enable us to carry out the provisions of our proposition.

" 3. We ask the city to rent of us 60 fire hydrants, at an annual rental of $70 each, · or a total annual rental of $4,200; said rental to commence upon the location of and furnishing water, as hereinbefore provided, of each of said hydrants, and approval of the common council; payments to be made quarterly, on such dates as will best subserve the interests of the city."

A proposition, not in writing, was also made to purchase from the city its waterworks.

October 13 the defendant company was organized, and on the 26th of that month a resolution was passed by the council, instructing the mayor and recorder to sign a contract, which was drawn in accordance with the foregoing proposition, and to sell the city waterworks. On November 8 the contract was signed. The defendant commenced to construct the works, which, under the contract, were to be completed by July 1, 1884. Not being then completed, an extension of two months was asked and granted. September 1, the works not being completed, further extension was asked and refused, the council passing the following resolution:

"*Whereas*, the Grand Haven Waterworks, in putting in waterworks in the city of Grand Haven, has failed to complete said works in the time agreed upon in their contract with said city; and—

"*Whereas*, there have been certain other violations of said contract on the part of said company:

"*Therefore, be it resolved,* that the said contract be, and the same hereby is, canceled and declared forfeited."  •

A copy of this resolution was served on the defendant on the 25th of that month. On November 6, 1884, complainant had notice from the secretary of defendant that the works were completed, and that rent would be charged from that date, and asking to have a day appointed for a test. The city attorney was instructed to make proper reply, saving all rights of the city. On November 28 the defendant presented a bill for the use of water to January 1, 1885, amounting to $700, which was laid on the table. On December 26, the defendant gave the city notice that it was ready to take up the old works of the city, and, if it could have possession of them within three weeks, it would take and pay for the same, and, if not, the company would not consider itself bound by the agreement. On January 15 a test was made, at which several members of the city council were present, though it does not appear that any formal action of the council was taken to attend or witness the test. It is not claimed that in this test the defendant was able to throw six streams of water, simultaneously, 100 feet high. It is said by defendant that the causes of this failure were that, the works being new, and never having been subjected to any severe strain, the pumps, by accident, disconnected; that the packing of the piston between the plungers of one of the pumps pulled out, and chips in one of the supply pipes were drawn into one of the pumps, and choked up the valves, greatly diminishing its capacity, and at the same time a leak occurred in one of the street pipes, and, besides, the city consumers

were drawing water from the pipes; and that, had it not been for these accidents, it would have been able to throw the water to the height agreed upon. On the evening of that day, the company, in view of this test, presented a communication to the council, asking that it "take some action on the subject of the relations between the company and the city." This was referred to a committee of the council, who on January 17 made the following report:

"That, in their judgment, the recent test of the water-works demonstrated their inability to do and perform the conditions and several tests as embraced in the proposition submitted to the common council by the S. L. Wiley Construction Company, September 25, 1883, of which the following are more particularly mentioned, viz.:

"1. That the water supply is insufficient for the purposes in said proposition mentioned, in that the supply of good and sufficient water for fire, mechanical, manufacturing, and domestic purposes, and not deleterious to the health of those using it, became exhausted in 20 minutes from the time the test began, whereby it became necessary to and connection was made with the river, wherefore the water then used was foul, dirty, impure, and entirely unfit for the purposes for which it was proposed it might be used.

"2. That the supply of water by the test was conclusively shown not to be ample for all purposes contemplated in said proposition.

"3. That the test demonstrated that the wells established are not of sufficient capacity for the purposes specified and contemplated in said proposition.

"4. That the system of pumping engines was demonstrated, by the test, not to be capable and durable and properly adjusted and located, as in said proposition provided and contemplated.

"5. That the test conclusively demonstrated that the pressure power of the pumping engines was not sufficient and equivalent to throw six one-inch streams in a perpendicular height of 100 feet simultaneously.

"6. That said waterworks are, in all essential respects, inadequate to the wants and necessities of the people and the city of Grand Haven, as provided in said proposition, and for the purposes for which they were contemplated."

On the same day the company asked the council for a

second test, which was afterwards refused. The city never accepted the works by any act of its council. In January and July, 1885, the defendant presented bills to the council for hydrant rental, and asked payments, but the council never made answer to the claims. The complainant continued in the operation of its own works, and in the beginning of 1887 began the extension of them, and from that time claims to have expended some $35,000 in such extension. Several times during the years 1885 and 1886 the defendant's works were used in times of fire, and in 1887, 1888, and 1889 the defendant's works were used for fire purposes by the city fire department, though it is claimed that such use was contrary to the express order of the common council, it appearing that on April 16, 1885, the council passed a resolution instructing the chief of the fire department not to use the water of defendant.

The bill is filed for rescission of this contract. It is claimed by complainant:

1. That the resolution of April 12, 1883, was never legally passed, in accordance with the charter of the city, and therefore defendant never had any rights under it.

2. That the contract was beyond the power of the council to make without a vote of the people authorizing it, and is *ultra vires.*

3. That the contract, as interpreted by the defendant in its answer, is a monopoly, divesting the city of its legitimate functions, and is, for that reason, void.

4. That the contract, if legal and binding in respect to the right of the council to make it, does not obligate either party to furnish or take water for any certain time.

5. That the city has not, by any act or use of the water, become liable to the defendant to take such water for the term of 25 years.

6. That, if the contract was a legal one in its inception, the defendant has not performed it; that it has not placed itself in such a position as equitably to require the city to approve the works or to receive water for any purpose, and that the city was justified in refusing such approval, and justified in extending its own works for the purpose of

furnishing its inhabitants with pure water for domestic purposes.

7. That the defendant refuses to bring suit to test its rights.

The answer asks no affirmative relief. It claims that the contract was a valid and binding one, and insists that the complainant is indebted to the defendant in the sum of $4,200 per year, with interest, since November 6, 1884. It insists that defendant has performed its contract; admits that it has furnished some river water to the people of the city, but claims it had the right to do so, and that the same was not unhealthy; claims that the city has used the water, and so accepted the contract; and asks that the bill be dismissed. The court below dismissed the bill. Complainant appeals.

We think the bill states a case of equitable cognizance, and we may add that, on the hearing here, the jurisdiction of a court of equity was admitted. It is very similar in principle to the · case of *Farmers' Loan & Trust Co. v. Galesburg,* 133 U. S. 156. It is for the rescission of a contract for non-performance, and as such is within the general jurisdiction of a court of equity. If ·the alleged contract is void, either from intrinsic infirmity or from failure to perform its terms, it may be so declared ·in equity. Story, Eq. Jur. §§ 698–700.

From the view we take of the case, we do not deem it necessary to discuss all of the questions raised by the pleadings and proofs, but shall confine ourselves to the discussion of one proposition, which we think decisive of the case, whatever disposition might be made of the other questions. For this purpose it may be assumed that the contract was a legal one in its inception; and from this we are led to the inquiry whether it is shown that the defendant has so carried out its terms that the council was bound to approve the works, and pay for the use of hydrants, as

contemplated by the terms of the contract, and therefore not justified in extending its own works to supply the inhabitants with water for fire and domestic purposes. It has been seen that the test did not show that the defendant could throw six one-inch streams of water 100 feet high simultaneously, and there is no showing upon this record that it has ever been able to do this. But, aside from this, the contract provides that the defendant shall establish wells of sufficient capacity, either open or driven, and construct all needful filters or infiltration galleries, and establish a good and sufficient water supply for fire and domestic purposes, and that said water shall not be deleterious to the health of those who may use it. At the time defendant claimed that the works were completed, it was unable to show by the test made that it could throw water to the height agreed upon; and in making the test the water in the wells was exhausted in 20 minutes, so that it at once began to draw water from the river. This fact being apparent, the council immediately decided not to accept the works. This action was based upon the claim that, under the true interpretation of the contract, the water to be supplied was to be from open or driven wells, and, it being necessary to take water from the river at the outset, the defendant was not in a position to ask and demand an acceptance of the works. The complainant also claims that water taken from the river was deleterious to the health of the inhabitants of the city.

We think the proofs abundantly show that the council was justified in its refusal to accept the works at that time, and that at no time since has the defendant been in a position to comply with its agreement, so that it could insist upon an acceptance of the works. The works were built on the Grand river; about 1½ miles above the city. Wells were put down, which supply much of the water, but

it appears that, at all times when needed for a fire, connection must be made with the river to get a sufficient supply. It also appears that, when any great number of persons are using the water simultaneously, the wells do not afford a sufficient supply for the use of the city. At the place where the works are situate, and where connection is made with the river, the ground is low and flat. For about 10 miles above Grand Haven, the river expands into immense rice fields and morasses, on a level with the surface of the river, and full of stagnant water and decaying vegetation. About a mile above defendant's works, a channel separates from the main river, turns to the left, and, with a feebler current, runs through rice fields, and again enters the river just below the defendant's works. It is into this channel the supply pipes are placed. About 700 feet below that point is a tannery; some 150 feet above is a saw-mill, with a privy situated over this channel; and about 1,000 feet above is another mill, employing from 100 to 200 men, its privies also situate near this channel. The channel and the marshes above are used for the storage and booming of logs. During most of the year the channel has but little current, and a strong wind would drive the water the other way.

A large number of witnesses were called, many of them the most prominent people of the city, who gave testimony showing that a large quantity of the water defendant had furnished to the inhabitants was river water, and unfit for domestic purposes. Many of the witnesses say that the defendant took the water from the river at all times for fires, and, during the summer season, for domestic purposes; and about all the witnesses characterize it as unfit for man or beast. Some of them say it could not be used except by boiling it, and that it was like stagnant water, and worms were found in it. Some of the physicians of

the city testify that there was an odor to it, and that it was deleterious to health; and one of them said: "My horse refused to drink it." Some of the testimony given by the defendant tends to contradict these statements, but we think the evidence overwhelmingly shows that the water supplied was unwholesome and unfit for domestic purposes, and deleterious to health. One witness testified that he had been engineer and superintendent of the defendant's works, and knew of the mills on this channel, and that these privies were situated over the channel.

It is claimed that, notwithstanding this condition of the water, the city ratified the contract made, and accepted the works, by the use it made of the water, at times, for fire purposes. It has already been stated that the council, by resolution, forbade the officers of the fire department to use it. It also appears that, from the time the first test was made, the city refused to accept the works, and in 1887 commenced the extension of its own works, and has expended large sums of money in completing them. We think there cannot be shown any act on the part of complainant showing, or tending to show, an acceptance; but, on the contrary, the conduct of the city officers shows conclusively that they refused to accept, and the facts disclose that they had good reason not to do so. They refused to pay the rental, and during all these years the defendant has failed to bring action to recover such rents or to test its right to recover. It is said that the defendant has now put down sufficient wells to supply good and wholesome water; but this was not done until the city had expended large sums of money in perfecting its own works, and that fact cannot now avail the defendant. The case seems to be upon "all fours" with *Trust Co. v. Galesburg, supra,* though the city has taken greater precaution to protect its rights than did the city in that case. There the city had passed a resolution accepting the works, and the court found

that the city had power to enter into the contract made. It was shown that after that time the water company had failed to supply sufficient water to meet the requirements of the contract, and that the water supplied was deleterious to the health of the inhabitants; and the city, by resolution, declared the contract void. The city also repossessed itself of its own works, which had been turned over to the water company, and extended them. It had never paid any rental for hydrants, and, the company being in default, the bondholders had foreclosed, and taken possession of the works. It was said by the court:

"The principal contention on the part of the appellants is that, on the acceptance of the ordinance by Shelton, a right in the franchise vested in him, which could not be defeated, even though he afterwards failed to comply with its terms; that the failure of the water company to furnish water in the quantity, and of the quality, called for by the ordinance, was only a breach of a condition subsequent, and that a court of equity will not lend its aid to divest an estate for such a breach. But it seems to us that, in respect to a contract of the character of the present one, the ability of the water company to continue to furnish water according to the terms of the ordinance was a condition precedent to the continuing right of Shelton and his assigns to use the streets of the city and to furnish water for a period of 30 years; and that when, after a reasonable time, Shelton and his assigns had failed to comply with the condition as to the quantity and quality of the water, the city had a right to treat the contract as terminated, and to invoke the aid of a court of equity to enforce its rescission. A suit for a specific performance of the contract, or a suit to recover damages for its non-performance, would be a wholly inadequate remedy in a case like the present. The danger to the health and lives of the inhabitants of the city from impure water, and the continued exposure of the property in the city to destruction by fire from an inadequate supply of water, were public questions peculiarly under the care of the municipality; and it was entitled and bound to act with the highest regard for the public interests, and at the same time, as it did, with due consideration for the rights of the other parties to the contract."

Applying the principles here laid down, with which we fully agree, it is seen that the complainant has not only a standing in this Court, but the right to a rescission of the contract, as prayed.

The decree of the court below must be reversed, and a decree entered here granting the relief prayed, with costs of both courts to complainant.  The cause will be remanded to the court below for an accounting for the use of the hydrants, as the city is equitably bound to pay for whatever use it has made of them for fire purposes.

The other Justices concurred.