PARSONS et al. v. EMPIRE TRANSP. CO.

(Circuit Court of Appeals, Ninth Circuit.  September 9, 1901.)

No. 669.

1. SHIPPING—LOSS OF CARGO—UNSEAWORTHINESS OF BARGE.

A barge *held* unseaworthy, from the manner of her construction, for a voyage between St. Michael and Nome, Alaska, in October, and her owner for that reason not entitled to exemption, under section 3 of the Harter act, from liability for the loss of cargo taken on board for such a voyage.

2. SAME—LIMITATION OF LIABILITY—LOSS THROUGH NEGLIGENCE.

A corporation engaged in the transportation of cargo and passengers between Seattle and Alaskan points maintained a line of steamers to St. Michael, which was the Alaskan headquarters of its fleet, and there transshipped to other steamers and barges, which were run by the company between that port and Dawson and other points on the Yukon river.  Its general manager was located at San Francisco, and he sent a superintendent to take charge of all the company's business at St. Michael.  Such superintendent being compelled to return, by reason of illness, in July, left in charge his assistant, who was incompetent for the position by reason of his inexperience in such matters, which was known to the general manager, but who was permitted to remain in charge during the remainder of the season.  About October 1st he contracted on behalf of the company to take a cargo to Nome, and loaded the same on a river barge, which was wholly unfit for such a voyage at that season, and which sank in a storm before having started, through the additional negligence of the agent in not having it taken to a safe place. *Held* that, whether such agent in fact had authority to accept such cargo, he had ostensible authority, and the company was bound by his action, and responsible for his negligence and incompetence, and was not entitled to a limitation of liability for the loss under Rev. St. §§ 4283–4285, which were not intended to relieve ship-owners from personal liability for their own willful or negligent acts.

Appeal from the District Court of the United States for the Northern Division of the District of Washington.

Brady & Gay and Edward Brady, for appellants.

Thomas R. Shepard, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge.  This was a proceeding instituted in the court below by the appellee, a New Jersey corporation, to obtain the benefit of the limitation of liability provided for in sections 4283–4285 of the Revised Statutes (embodying provisions of the act of March 3, 1851), and amendatory acts, and in section 3 of the act of February 13, 1893 (27 Stat. 445).  The petition sets forth, among other things, that on the 30th day of September, 1899, barge No. 2, of which the petitioner was the owner, was lying in the harbor of St. Michael, Alaska, alongside the steamer Lakme, chartered and operated by the Seattle & Yukon Transportation Company, transferring freight therefrom to the steamer; that the Lakme was to take the barge from St. Michael to Nome, Alaska, but that during the night of the day mentioned a heavy sea prevailed in the harbor, causing the barge to bump so hard against the side of the steamer as to induce the latter's captain to drop the barge astern of the steamer with about 40

fathoms of rope out, and that during the next morning the wind began to freshen and blow hard from the north, for which reason the captain of the steamer, desiring to drop astern of the Lakme the barge Admiral, which was also transferring stores on board the steamer, and had remained alongside of her during the night of September 30th, ordered the master of barge No. 2 to stand by, and drop his anchor, as he was going to cast that barge off from the steamer; that barge No. 2 was accordingly cast off, and, after drifting 600 or 700 yards in towards the shore, its anchor was dropped; that the storm continued to increase, and the waves began to dash over the bow of barge No. 2 and against its deck house, and that about 9 o'clock in the morning the barge began to settle by the head very rapidly; that the captain and crew of this barge were compelled for their own safety to abandon it, which was done by means of a lifeboat sent out from the steamer Lakme, and that thereafter barge No. 2, together with all her tackle, apparel, boats, and appurtenances, became a total loss; that no freight moneys were earned, paid, or received therefrom; that the accident happened and the loss mentioned was occasioned without fault, privity, or knowledge of the petitioner, and without the fault of any of its officers, agents, or servants, but was solely due to perils of the sea; that, notwithstanding those facts, certain persons (naming them), claiming to have lost their property on board of the barge, have already brought suits against the petitioner, and other suits are threatened, to recover damages for the alleged loss of such property, and for further damages by reason of the loss of work at Nome, Alaska, occasioned by the loss of the property, and that the actions alleged to have been commenced are still pending; that barge No. 2 was in all respects sound, staunch, seaworthy, and properly and efficiently fitted for the voyage upon which she was about to proceed, and properly manned and equipped, and commanded by a careful, competent, and experienced master. In the petition the petitioner, while not admitting, but denying, that it is under any liability for the loss or damage so incurred, and claiming the right to contest any liability therefor, further claims to be entitled to have limited its liability, if such shall be found to exist, to the amount or value of its interest in barge No. 2 immediately after the accident. The foregoing are, in substance, the averments of the petition, followed by the appropriate prayer, to which petition the appellants Parsons & Co. filed an answer and cross libel. By their answer the appellants admit that at the times stated in the petition barge No. 2 was lying in the harbor of St. Michael alongside the steamer Lakme, which was to take the barge from that point to Nome, Alaska, and also admit that the barge became a total loss, as alleged in the petition. But the answer denies all of the averments of the petition in respect to its seaworthiness, and also denies that the loss of the barge and its freight occurred without the fault, privity or knowledge of the petitioner or of any of its officers, agents, or servants, and denies that it was due solely or at all to the perils of the sea. By their answer the appellants also affirmatively allege that the loss of the barge and its contents was occasioned by the fault, privity, and knowledge of the petitioner and of its duly-author-

ized agent and manager, F. G. Patterson; and, further, that at the time of the accident the barge was unseaworthy, and was not properly fitted for the voyage she was about to undertake; was not properly manned or commanded, but was in charge of a watchman, without a master, and without a sufficient and competent crew. The appellants further allege that the petitioner received from them for transportation on the barge from St. Michael to Nome, Alaska, goods, wares, and merchandise of the value of $26,081, which became a total loss by reason of the negligence of the petitioner in the particulars above stated.

It appears from the record that in the year 1898 the appellee engaged in the business of transporting passengers and freight from Seattle, Wash., to Alaska, and for that purpose, and as parts of its fleet, had caused to be constructed at Nixon's shipyard at Elizabeth, N. J., under the superintendency of Capt. Peter Bloomsburg, four barges, numbered, respectively, 1, 2, 3, and 4, for carrying freight and coal; four barges for carrying passengers and freight; and two steamers, named, respectively, International and Empire, for towing the barges. Barge No. 2—the one here in question—was built of steel, with steel frames entire, two lattice girders running lengthwise inside for strengthening. It was built in 10 sections, each section being 10 feet long longitudinally of the vessel, 35 feet wide, and with a depth of 6 feet 6 inches. Each section had a water-tight bulkhead at each end. They were to be and were bolted together, forming a whole boat of 10 water-tight compartments. Three-inch angle bars were riveted in each end of each section. In that condition the sections were taken on cars from Elizabeth, N. J., to Seattle, Wash., at which place they were placed on the steamer Conemaugh, and carried to St. Michael, Alaska, where they were floated, and there in the water bolted together through the angle bars placed about eight inches apart at the top, bottom and sides. Before being removed from New Jersey, however, the sections were bolted together, thus forming a complete boat, and as such was measured and enrolled in the custom house at New York. The barge was also decked and housed in in sections at Elizabeth, but the house was taken apart, and conveyed in sections to St. Michael. The deck was of two-inch Florida pine, bolted together with steel deck beams. The house was built of one-inch white pine, dressed, with a sill running the length of the vessel, bolted through the deck, four by six, with a studding tenanted. The siding was then nailed to the top of the studding, three by six plank, mortised also to receive the upper end of the studding, on which the carline running across to support the upper deck was fastened, three 2½ by 5 ridge poles running under the carline fore and aft equal distance apart. On that was laid the upper deck, one-inch stuff, dressed, covered with No. 6 canvas, and painted; the forward and aft bulkheads being built of the same material and of the same dimensions as the sides. The extreme length of the house was 85 feet, its height 8 feet, and its breadth the same as the beam of the boat, 35 feet. The draft of the barge was 18 inches, the intention being to load her to five feet, which would leave about 18 inches above water when carrying a full load. It was in this barge

that the appellants' merchandise was stored by Patterson, acting for the appellee, for transportation to Nome, September 30—October 1, 1899. We have no hesitation in holding, as did the court below, such a craft unseaworthy for a voyage from St. Michael to Nome at that season of the year. Indeed, one of the appellee's witnesses, Capt. Barlow, who was employed as captain of one of the appellee's steamers, and whose experience as captain on the Pacific coast extended over a period of 14 or 15 years, testified that "a barge of that description has no business in Behring Sea at all"; certainly not, we think, at a season of the year when heavy storms are liable to occur at any time. This fact is virtually admitted by the learned counsel for the appellee in that portion of their brief in which they discuss the lack of authority in Patterson, real or ostensible, to undertake to send barge No. 2 to Nome; for they say that the appellee company, "having carefully selected its subordinates, and having in its fleet not only such barges as this [barge No. 2], designed solely for towing in a harbor and along a river, but also river steamers that might safely have made the voyage to Nome, if necessary, and deep-sea vessels that were fully adapted to that voyage, cannot be supposed to have contemplated that its agent, if he contracted in its behalf to transport freight from St. Michael to Nome, would use for that purpose a river barge, seaworthy for its restricted use, but not for a trip on a stormy sea, and least of all that he would so use the barge at the beginning of the Arctic winter, after the season of navigation had closed, and only one steamer remained in the harbor for a last departure to southerly ports, and after the barge itself had already been stored in winter quarters." Without regard, therefore, to the alleged improper loading and improper equipment and insufficient manning of barge No. 2 for the voyage undertaken by her, we hold, upon the facts appearing in the record, that she was not, as alleged in the petition for the limitation of liability provided for by section 3 of the act of February 13, 1893, in all respects seaworthy; for which reason the court below was right in refusing to award the petitioner the limitation of liability provided for by that act.

The court below, however, did award the petitioner the limitation of liability provided for by sections 4283–4285 of the Revised Statutes, and acts amendatory thereof, upon the ground that the petitioner "proved by satisfactory evidence that the losses and damages were entirely without the knowledge, privity, or negligence of any one of its managing officers." That question remains to be considered. The act of March 3, 1851, provisions of which are embodied in sections 4283–4285 of the Revised Statutes, provides, among other things, as follows:

"The liability of the owner of any vessel for any embezzlement, loss, or destruction, by any person, of any property, goods, or merchandise, shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, lost, damage, or forfeiture, done, occasioned, or incurred, without the privity, or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

At the time the appellee commenced its transportation business on the Pacific coast, Nome was not known. Dawson and other points

along the Yukon river were the places to which large numbers of people were flocking in search of gold, and to which large quantities of freight were then being shipped. So that the line established by the appellee, the general management of which was intrusted to George H. Higbee, with headquarters at the city of San Francisco, extended from Seattle, Wash., by means of deep-sea steamers, to St. Michael, Alaska, at which point passengers and cargoes were transferred by the appellee to its light-draft steamers and to barges. for transportation thence to Dawson and intermediate points. The transshipping point of St. Michael therefore became and was a very important point, not only because of the fact just stated, but also because of its remoteness from the general office of the appellee and also from its general manager on the Pacific coast. To that point was assigned, at the opening of the season of 1899, as the general superintendent of all of the company's business in that region, Capt. Bloomsburg, who, as has been said, not only superintended the con-- struction of the barges and some of the steamers of the company in New Jersey, but had had, as appears in the record, an extensive ex- perience as superintendent of various other transportation companies. There is no doubt from the evidence that he was competent for the position assigned him. He left Seattle for St. Michael early in June, 1899, but arrived at his point of destination so ill that he was com- pelled to return by the same ship, leaving St. Michael July 12th, and leaving in his place and in charge of all of the business of the ap- pellee at St. Michael, F. G. Patterson, who had been sent there by the appellee as the assistant of Capt. Bloomsburg, and designated freight and passenger agent. The appellee was advised of Blooms- burg's illness and return and of the fact that Patterson had been put in his place in charge of the company's business at St. Michael, and Patterson was by the appellee permitted to so remain during the balance of the season. The appellee's general manager, Mr. Higbee, testified that before Capt. Bloomsburg's departure for St. Michael in June, 1899, he (Higbee) gave him verbal instructions, which he con- firmed by letter of date June 8, 1899, in which he expressed the com- pany's "desire that all our fleet shall winter at St. Michael in some suitable place; that the crew, excepting the necessary watchmen, shall be discharged, and returned here in the fall, and to this end you should refuse to take cargo for a late trip, if, in your judgment, there is risk in being frozen up in the river for the winter, unless you can get sufficient freight money to pay the entire lay-up expenses during the winter, which we estimate at $20,000"; that he was in com- munication with Patterson during the season of 1899, who, as Higbee testifies, was first Bloomsburg's "assistant, more in the line of chief clerk," and who, so far as appears, was without any nautical knowl- edge, and without any experience in the matter of loading, equipping, manning, or operating water craft of any kind. That Patterson's. incompetency for the position of superintendent of the appellee's business. at St. Michael was known to the general manager, Higbee,. is shown by the fact that he telegraphed to Mr. Fahnestock, who was the general agent of the appellee on the Pacific coast, and was then at Dawson, to have Patterson select some suitable captain to assist

him in matters relating to the company's shipping interests; and is further shown by the following answer of Higbee to the question why he did not send some competent person to St. Michael to take the place of Capt. Bloomsburg,—his answer being:

"When Captain Bloomsburg arrived here [Seattle] ill, I was in San Francisco, and previous to that it was decided between Mr. Fahnestock and myself that either one or the other of us would go to St. Michael. I was detained in San Francisco, and Mr. Fahnestock started. He left here [Seattle] late in July, going in over the pass by Dawson, and was detained at Dawson all winter, and did not get to St. Michael; but we expected him to arrive there and be there in time to close up all our affairs in the fall. It would make it unnecessary to send a man in from here to take the place of Captain Bloomsburg, as all that he was sent up for was practically attended to, or would have been attended to, before any new man could have reached there."

So that Patterson, an inexperienced man, with full knowledge on the part of appellee's general manager for the Pacific coast, was allowed to act as general superintendent of all of its business at St. Michael, including the control of the entire fleet in those waters.

At the time of the accident which gave rise to the present proceedings, the brief season during which Alaskan waters can be navigated was about coming to a close, and the appellee's fleet was assembled in the harbor of St. Michael, and was being put in winter quarters. The appellee having some surplus stores on hand, Patterson, thinking it for the best interests of the company, concluded to send them to Nome, and there sell them; and the appellants also having a lot of merchandise left over were also desirous of sending it to Nome, which Patterson, acting for the appellee, agreed to ship at the rate of $20 a ton, along with the company's own surplus stores, on barge No. 2, in tow of the steamer Lakme. Accordingly, both the appellee's and the appellants' merchandise was put on board of the barge, and Patterson, acting for the appellee, sent the barge, by means of one of the company's tugs, alongside of and delivered it to the steamer Lakme for towage to Nome; shortly after which the barge, with all of the goods on board, was sunk, and became a total loss, as hereinbefore stated.

It will have been observed from the foregoing statement of the contents of the petition herein that the limitation of liability thereby sought was not in the petition based upon any lack of authority, real or ostensible, in Patterson to undertake the shipment of the appellants' merchandise to Nome, but the limitation of liability sought under the provisions of the Revised Statutes and acts amendatory thereof was based upon the averment that the losses and damages growing out of the accident were occasioned without the fault, privity, or knowledge of the petitioner, or of any of its officers, agents, or servants, but was solely due to perils of the sea; and that the limitation of liability claimed under the provisions of the act of February 13, 1893, was based upon the averment that the barge was in all respects sound, staunch, seaworthy, and properly fitted for the voyage upon which she was about to proceed, properly manned and equipped, and commanded by a careful, competent, and experienced master. Without considering the suggestion of the appellants that

the appellee is, by the averments of its petition, estopped to deny the authority of its agent Patterson, and without considering his actual authority to undertake in behalf of his company the shipment of the appellants' merchandise to Nome, we are of the opinion that he at least had the ostensible authority to undertake the shipment, and that by his act in that behalf the appellee is bound. The appellee, being a corporation, necessarily acts through agents of different kinds. In charge of all of its business on the Pacific coast it appointed a general manager, with headquarters at the city of San Francisco, and through him, and by reason of the illness of Bloomsburg, caused to be installed and maintained at St. Michael, as superintendent of all of the business of the company, including the dispatch of boats and the making of contracts for the transportation of passengers and freight, F. G. Patterson. He was its representative at that point, in charge of all of its operations, and the public was entitled to regard him in that light. It is a mistake to say, as do the counsel for the appellee, that the company's field of operations from St. Michael was limited to Dawson and the intermediate points; for the record shows that Clark, one of the appellants, saw the company's superintendent engaged in sending some of the company's own surplus stores to Nome for sale, and contracted with him, as such superintendent, to send by the same boat some of the appellants' merchandise, which Patterson undertook to do. Surely, the man to whose management the company's entire fleet of boats in those remote waters, as well as all of its other property in that region, was intrusted, should be regarded as the company's representative, and his dispatch of any of the company's boats to a neighboring point as being at least within his ostensible authority. His knowledge must, therefore, be regarded as his company's knowledge, and his acts as the acts of the company. That it was gross negligence to ship goods from St. Michael to Nome at the beginning of the winter season in barge No. 2 has already been sufficiently shown. But the appellee, through its superintendent, was guilty of further negligence in failing to send one of its tugs, and tow the barge to a place of safety, which the evidence shows might very readily have been done by the exercise of reasonable diligence. The truth is, as is abundantly shown by the record, that Patterson knew nothing about the shipping business, and was wholly unfit for the position in which the appellee permitted him to remain, and thus held him out to the public. It was not the intention of congress, by the provisions of sections 4283–4285 of the Revised Statutes, embodying provisions of the act of March 3, 1851, nor of any act amendatory thereof, to relieve shipowners of responsibility for their own willful or negligent acts. Craig v. Insurance Co., 141 U. S. 638, 12 Sup. Ct. 97, 35 L. Ed. 886; Moore v. Transportation Co., 24 How. 1, 16 L. Ed. 674; Walker v. Transportation Co., 3 Wall. 150, 18 L. Ed. 172; The Republic, 9 C. C. A. 386, 61 Fed. 109; The Colima (D. C.) 82 Fed. 665; Quinlan v. Pew, 5 C. C. A. 438, 56 Fed. 111.

The judgment is reversed, with costs to the appellants, and with directions to the court below to deny the petition for limitation of liability.