**ARKELL & DOUGLAS. Inc., et al. v. UNITED STATES.**

**THOMAS G. PLANT CO. v. SAME.**

(Circuit Court of Appeals, Second Circuit.
July 12, 1926.)

No. 374.

**Shipping ⬾138.**

Shipowner, neglecting to shift old bunker coal, *held* liable, under R. S. § 4282 (Comp. St. § 8020), for fire and water damage to cargo, by spontaneous combustion, and not entitled to limit liability under section 4283 (Comp. St. § 8021).

Appeals from the District Court of the United States for the Eastern District of New York.

Libels by Arkell & Douglas, Inc., and others, against the United States to recover for damages to cargo. The libel of Thomas G. Plant Company was by stipulation selected as a test case. Decree for the United States, and libelants appeal. Reversed.

Bigham, Englar & Jones, of New York City (D. Roger Englar and Henry B. Potter, both of New York City, of counsel), for appellants.

William A. De Groot, U. S. Atty., of Brooklyn, N. Y. (Horace M. Gray, Sp. Asst. U. S. Atty., of New York City, of counsel), for the United States.

Before MANTON, HAND, and MACK, Circuit Judges.

MANTON, Circuit Judge. These suits in admiralty seek to recover for cargo damage. There were 69 cases consolidated, and by stipulation the suit of Thomas G. Plant Company has been selected as a test case.

The Eastern Glade is a three-island cargo steamer operated by the appellee and carried the cargoes in question. She had three-story decks and four cargo holds—Nos. 1 and 2 being forward of the boiler and engine room spaces; Nos. 3 and 4 being aft of these spaces. No. 2 hold was divided by a wooden bulkhead, and part of it was used as a cross-bunker. The bulkhead could be shifted fore and aft, so as to accommodate the contemplated voyage and the amount of bunkers required. The ship was being operated by the Mallory Transport Lines, Inc., as agent for the United States Shipping Board represented by the United States Shipping Board Emergency Fleet Corporation, pursuant to a contract duly executed. The damage in question was due to fire and water, caused as hereinafter referred to. She had bunkered coal at Newport News and proceeded to New York prior to the voyage in question, where she loaded with outward cargo and sailed for south and east African ports in June, 1922. When she arrived at Durban, she had on board from 800 to 1,000 tons of coal. There she took on some bunkers, and on her return voyage she again called at Durban and filled up the ship's bunkers for a voyage home. On the way home, it was found that the coal was heating slightly although not considered in a serious condition.

It is abundantly established that the heating of bunker coal is not an unusual occurrence, and is not dangerous, if the coal is readily accessible. There is also established a well-recognized custom of removing bunker coal remaining in cross-bunkers at the end of the voyage to a place near the fire room bulkhead, before new coal is loaded into the bunker. Usually, the unused coal is at some point furthest away from the fire room, and is thus shifted aft as a precaution against spontaneous combustion. When the vessel reached New York, she had 800 or 900 tons of coal remaining in her bunkers. The captain reported to the man in charge of the operating details for the Mallory Company that there was old coal remaining in the ship and that it was necessary to have it shifted aft. Arrangements were made by the Mallory Company for the vessel to go down to Port Arthur and load a cargo of case oil, and to take on from 100 to 200 tons of coal at Norfolk, Va., and then, after loading at Port Arthur, to proceed northward to New York, where it was to complete the loading of its cargoes for south and east African ports. It was directed to shift the coal that remained in the bunkers at Norfolk, when northward bound. When the vessel arrived in New York, it was intended to shift this remaining coal from the wooden bulkhead to a point near the stoke hole door, where it could be first used on the contemplated voyage.

When the vessel arrived in New York, the chief engineer, who knew of the condition of the coal, notified the chief engineer who succeeded him of the condition of the coal and advised that it be moved aft. The general superintendent of the Mallory Line was also notified. The new chief engineer made an examination of the coal and found it had considerable heat in it. He tested it with a thermometer, and stated that he had orders that the coal be shifted. When the vessel had completed her loading at Port Arthur without having shifted the unused coal at that place, the orders were given by

the Emergency Fleet Corporation to have the ship proceed to Galveston and fill her bunkers with coal from the steamship Federal, which was then lying in the harbor at Galveston, laden with coal belonging to the Shipping Board. This bunkering of coal as thus arranged for was contrary to the arrangements made by the Mallory Line, and resulted in the sending of a telegram and letter by the Mallory Line to the District Director of the United States Shipping Board. The telegram read:

"Eastern Glade has 250 tons bunkers remaining from last voyage which we calculated burning en route·Norfolk. In view change bunkering arrangement necessary you arrange shift this coal before bunkering so as to consume first. Telegraph sailing and quantity bunkers taken and sailing."

In the letter it was stated that:

"It was necessary to move this coal from the forward end of the hold next to the wooden bulkhead, to the after end, so that it might be consumed first, inasmuch as it has already been aboard the steamer for four or five months. The vessel, as you know, has aboard about 50,000 cases of case oil, which were loaded in Port Arthur. Inasmuch as we have no telegram from you relative to the shifting of this coal, we presume that our instructions have been followed out and that the coal was moved before bunkering the vessel."

The coal was not moved. The vice president of the Mallory Lines telephoned to the manager of the operating department in New York, complaining of the change in bunkering arrangements without his company being consulted, and wrote later to the same effect. The manager replied several days later, stating that the traffic department at Washington was advised by the operating department in Washington as to the change. When the vessel arrived at Galveston, the representatives of the Shipping Board were advised.of the necessity of shifting the coal, and the manager of the operating department at Galveston said it was unnecessary to shift it. The captain wrote a letter, addressed to the United States Shipping Board at Galveston, stating, among other things:

"Please be advised that, before starting to bunker the above vessel, it will be necessary to move about 300 tons of old coal from the forward end of the lower bunker to the after end, so that it can be used as soon as possible. This coal has been in the bunkers for five months."

The manager was asked to give a written reply to this letter and refused to do so, but did say: "If Capt. Campbell didn't agree to take that ship out that he damned soon would get somebody to take her." Thereafter the new bunkers were loaded. When the vessel arrived in New York, the manager of the Emergency Fleet Corporation was advised that the old coal.had not been shifted as arranged.

Within one week after this notification, and on the 30th of November, 1922, the vessel sailed from New York on her voyage with case oil in Nos. 1 and 4 holds and general cargo in Nos. 2 and 3. On December 11, 1922, shortly after midnight, a fire broke out in the bunkers. It was in the old coal, which had been left there from the previous voyage. Efforts were made to extinguish the fire by using steam smothering lines, but this was unsuccessful. The steamer put into St. Vincent's, at Cape Verde Islands, where it was beached and holds Nos. 2 and 3 were flooded. Thereafter she was floated, proceeded on her voyage, and discharged her cargo in a damaged condition. The damage to the cargo, for which the libels have been filed, was·caused by fire and water employed in attempting to extinguish it, and also the jettison made necessary by the fire. While the ship was operated on behalf of the United States under the direction of the United States Shipping Board Emergency Fleet Corporation, it was engaged as a merchant vessel in the common carriage of merchandise for hire, and its responsibility must be judged accordingly.

It seems to be a well-settled custom that old.coal in bunkers should be shifted, usually to a place near the fire room door, before new coal is loaded. The reason for doing this is to prevent fire, or, as stated by one of the experts, that spontaneous combustion ·would arise unless this precaution is taken. There is ample proof of the necessity of shifting the coal here. There was warning by actual notice of the coal heating previous to the voyage in question, and the need for shifting the coal was stated to the managers of the Fleet Corporation, as well as to the officers of the Mallory Lines. The Mallory Lines communicated with the managers of the Shipping Board Emergency Fleet Corporation, and advised them of the fact that the coal remained unshifted, and suggested that it be removed. Whatever other reasons may have given rise to such a custom, it .is quite certain that such removal was made in order to prevent fire. Indeed, there seems to be no attempt to dispute the fact that

there is such a custom. The captain of the ship recognized it, and the man who seemed to have final authority in connection with the loading admits that there were old bunkers that should have been shifted, and also the fault in failing to shift. In the absence of express warning of the danger, such as was foretold by the heating of the coal, the respondent would have been liable for failure to observe and to take the usual precautions to guard against heating or fire; but liability is more absolute where, as here, the coal was in fact heating, and precautions were not taken to guard against the breaking out of fire. This constituted negligence, for which the owner of the ship is responsible. Brown v. Standard Oil Co., 247 F. 303, 159 C. C. A. 397; The Santa Rita, 176 F. 890, 100 C. C. A. 360, 30 L. R. A. (N. S.) 1210.

That the fire was caused by spontaneous combustion of the old coal is established. The chief engineer testified that he had sufficient opportunity to observe and to formulate the opinion; he asserts that it did. The wooden bulkhead was the No. 2 bunker. The log entries of December 11, 1922, verify this claim. No one suggests any other cause for the fire. The fire appears to have gradually penetrated through the wooden bulkhead, and as soon as it penetrated through this wooden bulkhead it was discovered by smoke coming out of the ventilators. There is no justification for rejecting the testimony resulting in the claim that the fire started in the coal bunker. This is where the original coal was located. It makes little difference that the coal received from the steamship Federal was wet, or that coal which had previously heated had cooled off. There is sufficient in the testimony, and, indeed uncontradicted, and against which there is nothing inherently improbable, which leads to the conclusion that the fire started in old bunkers, which should have been shifted. This sufficiently tells the cause and effect of the damage. Internat. Mercantile Marine S. S. Co. v. W. & A. Fletcher Co. (C. C. A.) 296 F. 855; Brown v. Standard Oil Co., 247 F. 303, 159 C. C. A. 397.

It is urged that sections 4282 and 4283 of the Revised Statutes (Comp. St. §§ 8020, 8021) are a defense to these claims. Section 4282 provides:

"No owner of any vessel shall be liable to answer for or make good to any person any loss or damage which may happen to any merchandise whatsoever, which shall be shipped, taken in, or put on board any such vessel, by reason or by means of any fire happening to or on board the vessel, unless such fire is caused by the design or neglect of such owner."

And section 4283 provides:

"The liability of the owner of any vessel, for any embezzlement, loss, or destruction, by any person, of any property, goods, or merchandise, shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity, or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

Under section 4282, if the fire occurred by reason of the neglect of the owner, that is sufficient to impose liability. It must be established that such neglect was with privity or knowledge of the owner of the vessel. The shipowner who seeks complete exemption under section 4282 cannot succeed merely by establishing that the loss occurred without his privity or knowledge. To exempt it, the court must be satisfied, not only that the loss occurred without the shipowner's privity, but also that it occurred without any negligence on his part. Providence & N. Y. S. S. Co. v. Hill Mfg. Co., 109 U. S. 578, 3 S. Ct. 379, 617, 27 L. Ed. 1038; Hines v. Butler, 278 F. 877. In the Hines Case, a petition for limitation was filed by the Director General of Railroads. It was found that the federal manager, Baltimore district, and the superintending engineer, were in the habit of going on the vessel where fire had occurred, and for which liability was sought to be imposed upon the shipowner, for the purpose of familiarizing themselves with conditions on board. It was held that petitioner was not entitled to exoneration under section 4282, but that he could limit his liability under section 4283. The reason for this distinction was that the petitioner's representatives were negligent in not familiarizing themselves with the improper conditions on board the vessel, but their neglect, being negative, did not amount to privity or knowledge. But the knowledge or neglect of the federal district manager and superintending engineer was held to be the neglect and knowledge of the Director General. Negligence was inferred from the complete lack of discipline which developed at the critical moment.

The question here presented is whether

the evidence establishes negligence on the part of the United States Shipping Board Emergency Fleet Corporation. There is no doubt that the managing and operating agent of the Mallory Transport Lines had knowledge. In addition to this, the managers of the Fleet Corporation were likewise informed of the failure to shift the coal. This neglect was brought home to the higher representatives of the appellee, the knowledge of the district agent of the Fleet Corporation at Galveston, the district director at New Orleans, the manager of the operating department in New York, and the manager of the operating department at Galveston, and the assistant manager of the Fleet Corporation at Washington. All seem to have had ample notice—first, of the custom to shift the coal; and, second, the failure to do so. This failure to shift the coal, brought to the attention of these representatives, forms a sufficient basis to predicate negligence on the part of the owner as well as knowledge and privity of the conditions. A general superintendent's knowledge of conditions, and negligence in failing in his duty to keep the boats of the company in good condition, was held sufficient to deny limitation of liability by this court in Sanbern v. Wright & Cobb Lighterage Co., 179 F. 1021, 102 C. C. A. 666. Knowledge or privity of managing officers or agents is the knowledge or privity of the corporation. Craig v. Continental Ins. Co., 141 U. S. 638, 12 S. Ct. 97, 35 L. Ed. 886; Texas & Gulf S. S. Co. v. Parker (C. C. A.) 263 F. 864; Great Lakes Towing Co. v. Mills Trans. Co., 155 F. 11, 83 C. C. A. 607, 22 L. R. A. (N. S.) 769; Parsons v. Empire Trans. Co., 111 F. 202, 49 C. C. A. 302; The Republic, 61 F. 109, 9 C. C. A. 386. This court held in Re P. Sanford Ross, 204 F. 248, 122 C. C. A. 516, that the owner of a piledriver could not limit his liability, when a claim arose resulting from the death of one of his employés due to defects in the craft. The petition to limit liability was denied, because a superintendent, whose duty it was to see that all vessels were in repair and properly equipped, was found to have had knowledge of the failure to supply a chock block. The efforts on the part of the captain of the vessel and of the agents of the Mallory Lines to have the old bunker coal shifted, and the telegrams and letters which were exchanged, not only put beyond the possibility of denial the claim of the appellant, that there was knowledge of the conditions on the part of the higher officers of the appellee, but

indeed condemn the appellee's system of handling its business.

The appellant has established that the fire was due to failure to shift the coal; it has established negligence by showing a failure on the part of the appellee to shift the coal as the custom and practice dictated. The libelant has assumed the burden, and sustained it, of establishing the cause of the fire and resulting damage. It has brought home knowledge and privity to the owner of the vessel; at least, knowledge of the higher representatives of the owners, which forbids appellee being released from responsibility under sections 4282 and 4283 of the Revised Statutes. Craig v. Continental Ins. Co., 141 U. S. 638, 12 S. Ct. 97, 35 L. Ed. 886.

Decree reversed, with costs.