## THE CARNIA.

### DINGFELDER et al. v. NAVIGAZIONE LIBERA TRIESTINA, S. A.

#### No. A–9711.

District Court, E. D. New York.

April 3, 1933.

Finkler & Finkler, of New York City (Frank I. Finkler, Jesse H. Finkler, and Michael C. Bernstein, all of New York City, of counsel), for libelants.

Loomis & Ruebush, of New York City (Homer L. Loomis, of New York City, of counsel), for claimant.

GALSTON, District Judge.

On or about September 19, 1926, 23,980 crates and 5,936 half cases of Spanish onions were loaded on the steamer Carnia at Denia, Spain, for delivery at New York. Of these, 10,000 crates and 3,000 half cases were consigned to the libelants, and 13,980 crates and 2,936 half cases were consigned to Boera Bros.

It is alleged that by reason of the negligence of the owners and those in charge of the steamer, and because of the unseaworthiness of the vessel, the cargo was damaged. The claim of Boera Bros. was assigned to the libelants.

The shipper of both lots was Boera Bros. The onions were examined in the warehouse before shipment and their condition was found to be good. Indeed, the master of the vessel said the onions in these crates were fine large onions, solid and hard. Accordingly, clean bills of lading were issued.

The onions were stowed in tween decks 1, 2, 3, 5, and 6. Tween decks 2 and 3 had no bulkhead between them and comprised one cargo compartment.

The Carnia arrived in New York on October 11, 1926, and docked at Pier 3, Erie Basin. The onions which were taken from hatches 2 and 3 were found to be damaged with soot and coal dust (whereas, the cargo discharged from the other compartments were in good condition); some of the packages of onions were wet. That the onions were damaged is proved by the testimony of the witnesses Balish, Worman, Boera, and Sweeney. A part of the shipment was condemned by the board of health.

The defense is that the ship was seaworthy, properly manned, equipped, and supplied; and that by virtue of the exception set forth in the bills of lading and other provisions of the bills of lading, the claimant is free from liability.

It is, moreover, contended that the onion damage involved was no greater than that which was to be expected in normal good transatlantic carriage and delivery. However, the claimant fails in respect to proof as to what such reasonably expected damage might be. At most, Paolovich, the master of the vessel, was of the opinion that the average condition of the cargo of this vessel was as good as other ships bring here.

It is next urged by the claimant that the onion damage involved was decay. It is asserted that both consignees . made applications to the customs house for a refund of

duty based on alleged decay of the onions. I am not at all persuaded that the consignees should be held to the strict terms of their notice of application for refund, particularly in view of the provisions of the Tariff Act. Title 19, U. S. C. § 387, par. 2 (19 USCA § 387(2), recites: "Where, at the time of importation, 5 per centum or more of the total value or quantity of fruit or other perishable merchandise in any invoice is decayed or injured so that its commercial value has been destroyed." It is to be noted that this section does not limit the claim to decayed merchandise. The proof in the case shows that there was some heating and some damage by sweat and coal dust. The shippers might very well have used the term "decay" to cover all of those aspects of the damage done. It was immaterial to the shipper whether he used the term "decay" or "injured," so long as the necessary basis existed for the laying of the claim. It was sufficient for the purposes of the shipper to show an adequate ground, but it was not necessary for the shipper to show all grounds.

In consequence the contention that the exception in the bills of lading as to damage arising out of decay, wetting, heating, and breakage, is not persuasive. The damage in question was caused by coal, coal dust, and ashes. The ship's log indicated that prior to reaching Denia, Spain, on September 18, 1926, there had been some trouble with spontaneous combustion which was noticed when coal was transferred by stevedores from the No. 3 hold to the bunker hold. The entry on September 20th, after the onions had been loaded, shows that the coal in the side bunkers and the cross bunkers showed signs of spontaneous combustion, and the hose was turned on. The lower hold No. 3 contained 400 tons of coal when the vessel left Denia. The vessel had 150 tons each in the side bunkers, and 120 tons in reserve, making a total of about 800 tons. An additional 100 tons were taken on at Gibraltar. Six hundred and fifty tons were required for the trip from Denia to New York. It is apparent that it was necessary to remove at least 150 tons of coal from the lower hold No. 3. It is not, therefore, surprising that the cargo in tween decks 2 and 3, which comprised but one compartment, without partition, should have been affected. To have stowed onions in tween decks 2 and 3 in close proximity to bunkers in which there had been fires caused by spontaneous combustion, without a thorough cleaning of the quarters, or preferably a shifting of the coal, was negligence. Ar-

kell & Douglas v. U. S. (C. C. A.) 13 F.(2d) 555.

It is contended, though, that if there were any coal dust damage that it had its source in a condition for which the steamer under its bill of lading was not responsible; and reliance is had on section 3 of the Harter Act (46 USCA § 192) for the exemption from liability of a seaworthy steamer "for damage or loss resulting from faults or errors in navigation or in the management of said vessel." So the claimant argues that the negligence of the men in the fireroom in damping the ashes during the course of the voyage, without closing the ventilators and hatches and nearby cargo spaces, was a fault in the management and navigation of the ship, for which the claimant is not responsible.

The difficulty with the argument is that the soot and ashes which may thus have disaffected the cargo were not the sole source of damage; and accordingly the cases cited by the claimant, The Silvia, 171 U. S. 462, 19 S. Ct. 7, 43 L. Ed. 241, The British King (D. C.) 89 F. 872, and The Mexican Prince (D. C.) 82 F. 484, and related cases, do not apply. On the contrary, if there are other causes of damage or if the cause of damage is left in doubt, the doubt should be resolved against the vessel. The Patria (D. C.) 125 F. 425; Jahn v. Steamship Folmina, 212 U. S. 354, 29 S. Ct. 363, 53 L. Ed. 546, 15 Ann. Cas. 748.

Another defense is that this is not a case of common carriage, and that accordingly the burden is upon the libelants, irrespective of any exceptions in the bills of lading, to establish negligence. This strikes me as a wholly disingenuous contention. It is urged that there is no allegation in the libel that the Carnia was a common carrier. Of course there is no allegation that the Carnia was a common carrier, but the ultimate facts on which that conclusion is based are alleged. For example, it is alleged that the steamer Carnia was engaged in the carriage of merchandise "for hire between Spain and New York." It further appears from the libel that at least two independent shipments were contracted for and they dispel any notion of a private charter. Moreover, all the proof indicates that the Carnia on the voyage in question was a common carrier. The answer itself sets forth three bills of lading, which are indicia of the status of the Carnia. That being so, and since the cargo when shipped was in good order, and since it was damaged

in the course of the voyage, the burden is on the carrier to show that the damage arose through an excepted peril. Jahn v. Steamship Fohnina, 212 U. S. 354, 29 S. Ct. 363, 53 L. Ed. 546, 15 Ann. Cas. 748.

Finally, it is contended that it was a condition precedent to libelants' cause of action that they show timely service of a notice of their claim and that they failed to do so. It will be recalled that the vessel arrived in New York on October 11, 1926. The bill of lading required the giving of a notice of claim prior to the removal of the onions. A notice of claim in the form of two letters dated October 15, 1926, was delivered by hand on that date to the claimant. Worman, the cargo surveyor, examined the onions on the pier on October 14th and on the 15th. He is confirmed by the witness Boera, who said that the onions remained on the pier for a number of days because the packages had to be reconditioned. His estimate of the time during which that took place was two weeks.

From the foregoing I conclude that the claimant has failed to account for the damage under the exceptions of the bill of lading.

The libelants may have a decree in accordance with this opinion.

If this opinion is not in sufficient compliance with the rule requiring findings of fact and conclusions of law, submit findings of fact and conclusions of law in accordance therewith.