In re SPENCER KELLOGG & SONS, Inc.

Ex parte HICKS et al.

No. 427.

Circuit Court of Appeals, Second Circuit.

July 24, 1931.

130

See, also, 24 F.(2d) 967.

Bigham, Englar, Jones & Houston, of New York City (D. Roger Englar, Chauncey I. Clark, Leonard J. Matteson, George S. Brengle, and Charles W. Hagan, all of New York City, of counsel), for Spencer, Kellogg & Sons, Inc.

Elizabeth Robinson and Lucien V. Axtell, both of New York City (Charles A. Ellis, of New York City, of counsel), for Burns and others.

Lester Hand Jayne, of New York City, for McEachin and others.

Kurzman & Frank, of New York City (Samuel B. Seidel, and Sidney Newborg, both of New York City, of counsel), for Ilfill and others.

George W. Riley, of Lockport, N. Y., and Oeland & Kuhn, of New York City, for Hicks, administratrix.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

Spencer Kellogg & Sons, Inc., is a New York corporation engaged in the manufacture of linseed oil, with its principal place of business in Buffalo, where live its chief executive officers. It has however a number of factories in other places, among which is one at Edgewater, New Jersey, on the west shore of the Hudson River opposite Ninety-Sixth street, Manhattan, whence it draws many of its workmen. In order to carry these across to its factory it had maintained a motor-boat, called "The Linseed King," a launch forty-five feet long with a beam of ten feet, equipped with a gasoline engine. This had a small wheel-house forward, slightly raised above the floor of the inclosed cabin which occupied most of the deck space. The sides of the cabin were glass windows, nine on each side, two at each end of each side being movable for ventilation, and allowing a doubtful egress. Two doors, one on each side, gave upon the deck just abaft the wheel-house which was separated from the cabin by an iron railing. A third door, double, opened upon the deck at the after end of the cabin; to each door led a short companionway of a few steps, the cabin's deck being below the main deck. Along each side of the cabin ran a seat, each capable of holding about eighteen men.

It was the custom of the company to send the launch from Edgewater in the early morning to receive workmen at the Manhattan shore, and carry them back to the factory before work began. In the past it had often been much crowded, over eighty men at times finding room to sit or stand in the cabin, whose total superficial area including the wheel-house, was but two hundred and thirty-three square feet, of which the seats took up about one-third. The accident, which is the subject of this suit, happened on Monday morning, December 20, 1926, and arose in the following way. The launch left the Jersey shore before daybreak in charge of one Rohweder, an experienced man, who had been substituted for another some weeks before. In Manhattan there joined him a chauffeur, named Roberts, detailed to give him general assistance, whom we may consider as a deck-hand. When Rohweder came to the New York shore he met drift ice which had come down the river on the tide during the night, driven upon the east shore by the west wind. He pushed through and at Manhattan found a crowd of expectant workmen waiting to be ferried across. How many he and Roberts took on board was not, and in the nature of things, could not, be surely fixed, but the District Judge found the number to be seventy-eight, and of this the company does not complain. It is as nearly right

as the nature of the evidence allows; we have no warrant to disturb it. The launch then got under way, and successfully passed through the thicker part of the ice upon her return. When Rohweder thought himself clear, and while at a speed of about seven miles an hour, the launch struck a cake or floe of ice which stove a hole in her port bow about eight by sixteen inches. The evidence as to what struck her is necessarily a little doubtful; it was quite dark and Rohweder could not tell. However, there was still ice about, and the probabilities are too strong to justify upsetting the judge's finding that this caused the hole. The launch at once began to fill and sank in about two minutes. In the interval the workmen fell into a panic, scrambling for the outlets, through which a number of them escaped. Although there were eighty life-preservers on board, either the press prevented the men from reaching them, or their fright paralyzed their judgment. Nevertheless, a number, thrown into the water, reached floating cakes of ice, and were eventually rescued after much exposure. How many were lost was never learned with certainty, and is immaterial to the purposes of this appeal; thirty-five bodies were found.

Some of those injured, and the administrators of some of those drowned, brought actions in the New York courts against the company; others made claim and threatened suit, so that the situation was apt for a proceeding to limit liability. The company filed its petition in March of 1927 and prayed an injunction against all proceedings upon any claim, including claims for workmen's compensation under the New Jersey act, except that those might be filed. On the next day it obtained the usual injunction pendente lite in the same terms, covering not only the claimants themselves, but the New Jersey commission. It surrendered the launch which had been raised, and had a value of fifteen hundred dollars, and procured an order of reference to a commissioner to receive claims. These the claimants filed in due course, and answered the petition, denying the right to limit.

The issues so arising came on for hearing before Hazel, J., and a large amount of evidence was taken, at the conclusion of which he denied the right to limit, and referred the liquidation of all claims to a new commissioner, who heard more evidence and reported back to the court. This report came on for hearing upon exceptions before Patterson, J., who confirmed some of the awards as fixed, and changed the amount of others. No question is raised as to these amounts. Those claimants whom he found to have been in the company's employ, he remitted to their claims under the New Jersey Workmen's Compensation Act, except the administrator of Roberts, who as a maritime worker he thought not subject to state law. The rest recovered general indemnity.

The company appealed because of the denial of its limitation, and for the failure to remit to compensation those claimants who had already applied for work on Saturday, and had been told to come back. The claimants who had been awarded only compensation also appealed. They argued that their contracts were from day to day, and that they were not employed till they reached the factory. Furthermore that the Compensation Act could not apply to a suit in the admiralty, and that if it did, the conduct of the company in enjoining them pendente lite from prosecuting their awards was a repudiation of the contract of compensation on which they were entitled to elect to invoke the company's general liability. The issues therefore are, the right to limit; which claimants are covered by the Compensation Act; its effect in the admiralty; the right of the company to invoke it.

■■ The chief of these is the right to limit, which the company now agrees should not extend to compensation. As to this, the fault must be of an officer high enough in control to charge the company personally. Stover, the manager of the factory at Edgewater, was in that position. He was indeed under the direction of the chief officials in Buffalo, who made frequent visits to Edgewater, and always maintained supervision of this, as of all the other plants, but in their absence he was in charge, and it is not open to doubt that for any fault of his the company was personally liable. In re Jeremiah Smith & Sons, 193 F. 395 (C. C. A. 2); In re P. Sanford Ross, Inc., 204 F. 248 (C. C. A. 2); Eastern S. S. Corp. v. Great Lakes, etc., Co., 256 F. 497 (C. C. A. 1); Parsons v. Empire Transp. Co., 111 F. 202 (C. C. A. 9); In re Pennsylvania R. R. Co., 48 F.(2d) 559 (C. C. A. 2) semble. It is immaterial whether he disregarded his instructions. His fault charged his principal as though the limitation statute did not exist.

■ The officials at Buffalo had recognized that the launch was not fit to encounter ice, and had directed Stover to discontinue her service as soon as it appeared in the river. Indeed, while she may have been fit to pass through slush, the company's own witnesses

conceded that she should not have been exposed to floes or heavy cakes. It was a fault to allow her to go out, when there was reasonable expectation that such ice might be met. The weather had been unseasonable in New York during the first week of December, about fourteen degrees below the usual range, and at an average minimum of about 14° F. Presumably it was colder in the reaches of the Hudson above Manhattan Island. During the next week the cold abated, the minimum being just below freezing and the mean well above. This was a condition which would release any ice formed above, and allow its slow descent. The third week turned cold again, rising only once to freezing, and running as low as seven degrees on the eighteenth. On that day, Saturday, ice came down below Ninety-Sixth street on the Manhattan shore, but by the weight of the evidence none was observed opposite Edgewater on Sunday, and we may take it that at sundown there was no reason to believe that the river was not clear at that point, though there was much ice not many miles above, with knowledge of which Stover was clearly chargeable.

■ Rohweder, we are to assume, was a competent man. He had instructions from Stover not to press through ice, and if these were enough, it is impossible to charge his superior with fault. We think that they were not. The degree of care exacted in any situation depends, not only upon the likelihood of injury, but on its gravity if it comes. Laying aside the question whether it was of itself a fault to crowd so small a boat with so many men—whatever may be the practice in New York Harbor—it is at once apparent that their safety is at the risk of any mishap. They were sure in such weather to seek the cover of the cabin, where they must be huddled together in their overcoats, standing and sitting. The launch had been as full more than once before, and Stover knew that a crowd would be on hand, because a ship had arrived on Sunday which was waiting her discharge, and many men had been told on Saturday to come back. Such a launch in the dark of the morning could meet with no accident which would not be likely to spread panic, and cause death or injury to those on board, even though she did not sink and drown over half her company. If she did sink, there was no escape for more than a few at best, and the alternative for them was the icy waters of the river.

If employers are justified in undertaking such transportation at all, they must use the greatest of possible care; chances must be ruled out, though remote. We do not say that they can be so justified, but when such a craft, so crowded, is used at a season when ice is likely to be in the river, and has already been seen within forty-eight hours, nothing but the extremest precautions could exculpate any one concerned in the venture, if even these will serve. Faced with such grave possibilities, it was not enough to leave the decision to a competent subordinate. It is difficult to excuse the failure entirely to suspend the service on Saturday when the ice had once appeared, but if we are to suppose that anything could justify its continuance, Stover was bound to the most elaborate precautions, even if it involved going along himself. Perhaps this was not necessary; possibly inquiries of the towing companies that morning would have served. What he should not have done was to leave the decision to the judgment of Rohweder. We hold that the company has not shown Stover free from fault.

■ Normally, the result would be to charge the company generally with all the ensuing loss, but this is complicated by the different relations which the men bore to it. Part of them had been regularly in its employ the week before. Their contract was of the ordinary sort, and they could have been turned off on Saturday, or, we may assume, at the end of any day. They had not been. Rather they came back on Monday in continuance of an employment which had persisted over the week end. There was no new "contract of hiring" (N. J. Workmen's Compensation Act § 9 [Comp. St. Supp. 1924, § **236—9]), when they appeared that day; they were going on with an existing contract, as they had from day to day theretofore. This appears to be the construction placed upon the statute by the New Jersey courts themselves. Alberta Contracting Co. v. Santomassimo (N. J. Sup.) 150 A. 830.

■ The opposite is concededly true of those who for the first time boarded the launch on Monday morning in search of work, but there was a third class who had already appeared on Saturday, looking for work as stevedores to discharge the ship we have mentioned, expected that day, which did not, however, dock till Sunday. Having gone to the factory, these had been told to report back on Monday, when she would be in. They were given cards in evidence of the fact that they had already applied, which would entitle them to a preference when jobs were assigned. From this the company argues that

they were already in its employ, and equally subject to the Compensation Act as its regular employees.

We think not. The New Jersey act does not assume to impose workmen's compensation upon both parties against their will. Section nine imputes an intent to both sides by contract to substitute its provisions unless they stipulate otherwise. It reads: "Every contract of hiring * * * shall be presumed to have been made with reference to the provisions of section two of this act, and unless there be as a part of such contract an express statement in writing * * * that the provisions of section two * * * are not intended to apply, then it shall be presumed that the parties have accepted the provisions of section two * * * and have agreed to be bound thereby." The employee releases his rights at common law, or by statute, and in return gets a promise of compensation; the employer promises to pay compensation and receives the release. This result depends upon some "contract of hiring," without which the legal relations of the parties remain unchanged. That no such contract was made with these men on Saturday is too plain for debate. They were then assured of no work, of only a preference among those who might apply; at most any "contract of hiring" was conditional upon jobs, still unfilled, when they appeared. The New Jersey courts have gone to much greater lengths in treating such preliminary engagements as not within the act. Sabella v. Lloyd Brazileiro, 86 N. J. Law, 505, 91 A. 1032, affirmed 87 N. J. Law, 710, 94 A. 1103; Fineberg v. Public Service Co., 94 N. J. Law, 55, 108 A. 311; Coco v. Wilbur, 104 N. J. Law, 275, 140 A. 790. We find it unnecessary therefore to discuss the question whether the prospective employment of these men was maritime in such sense as to avoid the effect of the Compensation Act. They were not within it by its own terms.

■■■ That the regular employees suffered their injuries "in the course of their employment" is well settled by the New Jersey decisions. Fisher v. Tidewater Bldg. Co., 96 N. J. Law, 103, 114 A. 150, affirmed 97 N. J. Law, 324, 116 A. 924; Soden v. Public Service Co., 134 A. 560, 4 N. J. Misc. R. 817, affirmed 103 N. J. Law, 713, 137 A. 437; Bolos v. Trenton, etc., Co., 102 N. J. Law, 479, 133 A. 764; Alberta Contracting Co. v. Santomassimo (N. J. Sup.) 150 A. 830. Though Soden v. Public Service Company was affirmed without opinion by an equally divided court, the division was probably because of more doubtful points which were involved. The notion is that when the employer furnishes a conveyance to the employee to go to and from his work, the transit is part of the "course of employment." Whether as a new question this should be limited to such vehicles as he is required to board—as was the case in Van Gee v. Korts, 252 N. Y. 241, 169 N. E. 370 —we need not decide; nor indeed does that decision seem so to limit the doctrine, though it mentions with approval the English law which is apparently so. Anderson v. Hickman, 21 B. W. C. C. 369. The general rule in this country accords with New Jersey. Donovan's Case, 217 Mass. 76, 104 N. E. 431, Ann. Cas. 1915C, 778; Sala v. American Sumatra Tob. Co., 93 Conn. 82, 105 A. 346; Wabnec v. Clemons Logging Co., 146 Wash. 469, 263 P. 592; Lamm v. Silver Falls Timber Co., 133 Or. 468, 277 P. 91, 286 P. 527, 291 P. 375. In any case, as the question involves the construction of a statute we are to follow the local interpretation.

■■■ The claimants argue that in a limitation proceeding in the admiralty the New Jersey law must yield, following those cases which began with Southern Pac. Co. v. Jensen, 244 U. S. 205, 37 S. Ct. 524, 61 L. Ed. 1086, L. R. A. 1918C, 451, Ann. Cas. 1917E, 900. The point is not good. Though the locus of a tort in general controls jurisdiction in the admiralty (Atlantic Transport Co. of West Virginia v. Imbrovek, 234 U. S. 52, 34 S. Ct. 733, 58 L. Ed. 1208, 51 L. R. A. (N. S.) 1157), the "law of the sea," which no state may modify—so far as uniformity is required—does not govern all that takes place on navigable waters. In a number of decisions the Supreme Court has enforced compensation statutes, though the injury was not on shore. Grant Smith-Porter Ship Co. v. Rohde, 257 U. S. 469, 42 S. Ct. 157, 66 L. Ed. 321, 25 A. L. R. 1008; Millers' Indemnity Underwriters v. Braud, 270 U. S. 59, 46 S. Ct. 194, 70 L. Ed. 470; Rosengrant v. Havard, 273 U. S. 664, 47 S. Ct. 454, 71 L. Ed. 829; Alaska Packers' Association v. Industrial Accident Comm., 276 U. S. 467, 48 S. Ct. 346, 72 L. Ed. 656. It is only when the services which give the contract its color, are themselves maritime, that the doctrine comes into play. Baizley Iron Works v. Span, 281 U. S. 222, 50 S. Ct. 306, 74 L. Ed. 819. The regular employees had no maritime duties; they merely chanced to be on the water when injured.

■■■ Had the statute affected to substitute compensation for liabilities arising under New York law, regardless of the parties' will,

we might indeed be obliged to deny it any extraterritorial effect; the power of a state is ordinarily limited by its borders. On the other hand, if there had been an express contract between the parties, we can see no difficulty in its enforcement elsewhere, provided the parties intend it to have that scope. To be sure, the effect of the workmen's agreement to release his rights must be determined by the law of the place where they arise (Restatement of Conflict of Laws, § 396E), but if the agreement be valid where made, there could be no reason for not enforcing it, unless it be abhorrent to the policy of the state where the injury occurs.

Since the New Jersey statute imputes a contract from the employment alone, it is a fiction to say that the parties truly contract. In general, indeed, the law does impose that meaning upon any promise which seems to it best, regardless of the promisor's actual intent, but the meaning it chooses depends upon what an ordinary person, set as the promisor, would have understood by the words used. Yet it would make no difference under the New Jersey act that neither party knew of its existence; he would be equally bound. Whatever the guise, no actual contract is made, save by accident and in especial instances. It might therefore have been held that such statutes created obligations ex proprio vigore, to which another state need give no extraterritorial effect, and it is in part for this reason that they have raised a good deal of confusion in the books. However, only two questions arise here; whether the act was intended to apply to liabilities arising elsewhere, and if so, whether the courts of New York recognize its effect. The first is answered by Rounsaville v. Central R. R. of N. J., 87 N. J. Law, 371, 94 A. 392; the second by Barnhart v. American Concrete Steel Co., 227 N. Y. 531, 125 N. E. 675. It is quite true that the reasoning in the New York case proceeds on the assumption that there is an actual contract, but it is of no consequence whether or not we might agree. It establishes the law of New York and while strictly it may not be controlling upon us, we can see no reason for not following it here. Certainly there is no such clear current of authority, which could justify our declaring that there was any principle of "general law" to the contrary. Indeed, as mere matter of principle, while it is true that the obligation is imposed without the parties' consent, it is not in invitum; the obligor may escape it at will. Such obligations certainly are in a midground between contracts, stricti juris, and involuntary liabilities. It

would be presumptuous for us to hold that the courts of New York which treated them as a bar to liabilities arising in that state, violated any doctrine of the conflict of laws.

There remains only the claimants' objection that, granting all that we have decided, the company repudiated its obligation under the New Jersey Compensation Act, and left them free to elect to stand upon their rights at common law or under the New York death statute. Were we to look upon the obligation to pay compensation as not contractual, the answer would be simple. No equity prevented the company from asserting the release. All that happened was that it had got a stay pendente lite of the compensation claims. This was in March, 1927, and the trial came on in the following January. For ten months the claimants had thus been held up, but no longer, because on the first day of the trial the company's advocate declared that it stood ready to pay workmen's compensation to all its employees. Nothing had meantime happened, and the delay was of no consequence to the claimants who themselves repudiated compensation awards and demanded damages. The company's action had not prejudiced whatever rights they had.

If, however, we are to deal with the case as though there was really a contract, as no doubt we must, considering the views of the courts of New Jersey and New York, other considerations apply. The claimants' theory in that case must be that in filing their claims in this proceeding they elected to seek restitution upon the company's breach or repudiation; restitution in this case being a cancellation of their release, which would restore them to their rights under New York law. The remedy presupposes a repudiation, or at least a substantial breach by the promisor (South Fork Canal Co. v. Gordon, 6 Wall. 561, 18 L. Ed. 894; Farmers' L. & T. Co. v. Galesburg, 135 U. S. 156, 10 S. Ct. 316, 33 L. Ed. 573; Guerini Stone Co. v. Carlin Stone Co., 248 U. S. 334, 342, 343, 39 S. Ct. 102, 63 L. Ed. 275); and while a delay in payment for ten months might be a substantial breach, in this case it was excused. The company did not refuse to pay at all; it applied to the court on a true statement of the facts and took advantage of its order. It is true that the order was mistaken, but it was none the less an excuse for the breach while it stood. It was the court, not the company, which prevented the claimants from proceeding; it was the court which declared that the company need not pay at once. True, the company had procured the order, and was its

author in a sense which would have associated it in responsibility, had the court been a juristic person. It was not, and the company was insulated from legal liability. Any one who acts honestly and does not subject himself to a charge of malicious prosecution is as free from liability in invoking the action of a court as the court itself, and what he does under its order is not a wrong. The party aggrieved has no remedy except in so far as the court may have protected him by bond or otherwise, as a condition upon the order, and as security against its own errors. Meyers v. Block, 120 U. S. 206, 211, 7 S. Ct. 525, 30 L. Ed. 642; Tenth Ward Road Dist. v. Texas & Pac. R. R. Co., 12 F. (2d) 245, 45 A. L. R. 1513 (C. C. A. 5); American Circular Loom Co. v. Wilson, 198 Mass. 182, 84 N. E. 133, 126 Am. St. Rep. 409; Yonkers v. Fed. S. R. Co., 221 N. Y. 206, 116 N. E. 998; Tilton v. Sharp, 84 N. H. 43, 146 A. 159; Rieger v. Knight, 128 Md. 189, 97 A. 358, L. R. A. 1916E, 1277; Jacobs v. Greening, 109 Kan. 674, 202 P. 72; Hayden v. Keith, 32 Minn. 277, 20 N. W. 195. These decisions did not concern contracts, it is true, but if a tort is excused by an injunction, there can be no reason to treat otherwise a breach of contract; and so it was held in the only case we have found. Bedell v. Harris, 228 App. Div. 529, 240 N. Y. S. 550. New York v. Brown, 179 N. Y. 303, 72 N. E. 114, is not to the contrary. It may constitute an unjust enrichment to retain benefits secured by the injunction, though the acts or omissions which it excuses are not themselves actionable wrongs. That doctrine has no application here.

■ There was therefore no basis for disaffirmance by the claimants. Moreover, many of them were in no position to disaffirm, if there had been. Those who had already made claim or sued for damages, committed the first breach. This precluded their disaffirmance. White Oak Fuel Co. v. Carter, 257 F. 54 (C. C. A. 8); Stadelmann v. Boothroyd, 170 Minn. 430, 212 N. W. 908; Ashbrook v. Hite, 9 Ohio St. 357, 75 Am. Dec. 468; Ketchum v. Evertson, 13 Johns. (N. Y.) 359, 7 Am. Dec. 384; Schmidt Bros. Const. Co. v. Raymond, 180 Iowa, 1306, 163 N. W. 458; Williston § 1468. Of the rest, many were administrators appointed in New York. They were not the parties entitled to compensation under the New Jersey Compensation Act, § 12 (g), Comp. St. Supp. 1924, § **236—12 (g), and could not disaffirm a contract of which these were the beneficiaries. In re Balais, 189 App. Div.

408, 178 N. Y. S. 519, affirmed 228 N. Y. 507, 126 N. E. 899. A few indeed there are, who are neither administrators, nor first broke their compensation contracts; but though these might have disaffirmed, had there been an unexcused breach, they never elected to do so. The claims themselves suggest nothing of the sort, and they are susceptible of quite another interpretation—the true one. The claimants supposed, and still maintain, that the Compensation Act did not cover their case at all, and they claimed damages for that reason. They have never therefore manifested any intention to disaffirm, as they must do either in their suit or before. Hennessy v. Bacon, 137 U. S. 78, 11 S. Ct. 17, 34 L. Ed. 605; Williston § 1469. The regular employees were therefore correctly limited to compensation.

■ The case of Roberts is an exception; the District Judge thought that he was engaged at the time in maritime service, and was for that reason outside the scope of the Compensation Act. It is true that his work appears to have been only for the occasion; but nothing turns on that, if it was of a kind to which the law of the sea applies. On the whole we think it must be so regarded; his duties, as we have said, were most like those of an ordinary deck-hand, though the craft was small. As to him, while engaged in that service, the Compensation Act could not apply under the decisions we have cited. It follows that the disposition by Patterson, J., of all the claims was correct.

■ It is somewhat faintly suggested that he should have retained jurisdiction over the compensation claims, and not remitted the claimants to the New Jersey commission. Taken literally, some of the language in Hartford, etc., Co. v. So. Pac. Co., 273 U. S. 207, 47 S. Ct. 357, 71 L. Ed. 612, might be read as going so far, but we cannot suppose that it is to be pressed to that extent. The District Court was in no position to take charge of such awards, and could not close the case for nearly six years, if it had, since the death compensation extends for that time, § 12 (k), Comp. St. Supp. 1924, § **236—12 (k). Furthermore distribution among dependents is to be as the commission shall determine. Section 12 (h), Comp. St. Supp. 1924, § **236—12 (h). To those injured payments are likewise made seriatim. There is a machinery set up for all this, an inherent part of the contract itself, which a court would violate, should it undertake to substitute itself for the commission. All that it

could do was to decree that the parties should be free to prosecute their compensation in the usual way. This it did.

Decree affirmed.