744 F.2d 287
 1984-2 Trade Cases 66,196
 PHILIPS BUSINESS SYSTEMS, INC., Plaintiff-Appellant-Cross-Appellee,
v.
EXECUTIVE COMMUNICATIONS SYSTEMS, INC., trading as Executive
Communications Systems, Charles McGuire and
Cornelius Fitzsimons,
Defendants-Appellees-Cross-Appellants.
PHILIPS BUSINESS SYSTEMS, INC., Plaintiff-Appellant-Cross-Appellee,
v.
Don A. CARLOS, d/b/a D and S Business Systems, D and S Word
Processing Systems, and Diskriter,
Defendants-Appellees-Cross-Appellants.
 Nos. 1371, 1372 and 1777 to 1780, Dockets 83-7842, 83-7959,
84-7236, 84-7238, 84-7240 and 84-7242.
 United States Court of Appeals,
Second Circuit.
 Argued June 11, 1984.
Decided Sept. 12, 1984.
 
 John T. Morin, New York City (Gifford, Woody, Palmer & Searles, New York City, of counsel), for plaintiff-appellant-cross-appellee.
 Dennis C. Fleischmann, New York City (Emmett, Marvin & Martin, New York City, of counsel), for defendants-appellees-cross-appellants.
 Before FRIENDLY, VAN GRAAFEILAND and WINTER, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 Philips Business Systems, Inc. ("PBSI") appeals from a judgment dismissing its claims brought under the Robinson-Patman Act against two of its distributors, Executive Communications Systems, Inc. ("Executive") and Don A. Carlos ("Carlos"). PBSI also appeals from an order awarding $59,342 in attorney's fees to Executive and Carlos. Executive and Carlos cross appeal, seeking attorney's fees for time spent litigating the fee issue. We affirm the dismissal of the actions but reverse the attorney's fee award. We affirm on the cross-appeal.
 
 BACKGROUND
 
 2
 This appeal is the latest chapter in the overly long history of litigation between PBSI and two of its distributors, a saga that has entailed three lawsuits and three appeals but that has yet to reach a trial on the merits.
 
 
 3
 Until July, 1981, PBSI marketed NORELCO office products through an organization comprised of 55 Exclusive Distributors ("ED's") and 90 Independent Retail Outlets ("IRO's"). Each ED was assigned a Primary Area of Responsibility ("PAR"), and PBSI agreed neither to appoint another ED nor to compete directly for sales within the PAR. Other ED's, however, were free to enter the PAR on their own initiative. The IRO's, established by PBSI in 1979, were designed to replace failed ED's or to cover areas not already assigned to an ED.
 
 
 4
 Within this marketing system, IRO's and ED's served similar functions. Both sold NORELCO products to wholesale dealers and to retail consumers. ED's, however, provided customer service and received more favorable marketing terms from PBSI than did IRO's. Pursuant to Exclusive Distributor Agreements running from July 1, 1978 to June 30, 1981, ED's: (1) were allowed to purchase merchandise from PBSI at a discount 16.6% greater than that offered IRO's; and (2) were given 60 days to pay for inventory purchased, rather than the 30 days allowed the IRO's. PBSI also had a longstanding practice of allowing ED's to purchase individual Yellow Pages advertisements characterizing themselves as exclusive area distributors of NORELCO products. PBSI would pay one-half the cost of these advertisements.
 
 
 5
 On July 1, 1981, the day the ED agreements expired, PBSI attempted to change its marketing system by eliminating the distinction between ED's and IRO's. Under the new plan, all NORELCO distributors would henceforth receive the same discount rate (one more favorable than that formerly offered ED's), the same 30 day payment terms, and the same advertising privileges. Additionally, PBSI would have the right to sell inventory to multiple vendors (former customer-dealers for example) and to compete directly within a PAR. Executive and Don Carlos, both ED's, sued separately to enjoin PBSI from putting its new marketing system into effect.
 
 1. The First Action: Executive v. PBSI
 
 6
 On June 26, 1981, before the marketing changes went into effect, Executive filed suit in the Eastern District of New York pursuant to The New Jersey Franchise Practices Act, N.J.Stat.Ann. Secs. 56:10-1 to :10-15 (West Supp. 1984). Executive sought damages and an order enjoining PBSI from terminating, cancelling, or otherwise amending the Exclusive Distributor Agreement of 1978 so far as it applied to Executive. Jurisdiction was based on diversity of citizenship.
 
 
 7
 On July 30, 1981, Judge Bramwell issued a preliminary injunction. See Executive Business Systems v. Philips Business Systems, No. CV-81-2075 (E.D.N.Y. July 23, 1981). He found that the loss of the Exclusive Distributorship would cause Executive irreparable harm by forcing it to compete with PBSI directly. He further found that Executive was likely to succeed on its claim under the New Jersey Franchise Act since it qualified as a franchise and PBSI had failed to continue the identical prior relationship without either the required 60 day written notice or the necessary "good cause." NJSA Sec. 56:10-5.[1] The preliminary injunction ordered PBSI not to cancel, terminate or otherwise amend the July 1, 1978 Distributorship Agreement with regard to Executive and not to communicate with anyone now engaged, or about to be engaged, in buying, selling, or dealing with Executive concerning products covered under that agreement.
 
 
 8
 The preliminary injunction was upheld by this court on November 27, 1981 in a summary order stating, inter alia, that that alteration of the distributorship relationship might force Executive into ruinous competition with PBSI and that the injunction merely maintained the status quo by preserving "Executive's exclusive distributorship and protect[ing] its existing clientele from any interference which did not exist prior to the lawsuit." Executive Business Systems v. Philips Business Systems, 679 F.2d 872 (2d Cir.1981). We considered no federal legal issue.
 
 
 9
 Executive moved in the district court to have PBSI adjudged in contempt for violating the preliminary injunction. Executive alleged, inter alia, that, (1) PBSI's attorney had contacted two of Executive's customers to procure affidavits from them detailing their business relationship with Executive; (2) PBSI was not giving Executive the additional 16.6% discount it had enjoyed over the former IRO's; (3) PBSI was not allowing Executive 60 days for payment of inventory purchased; and (4) PBSI would not allow Executive separate Yellow Pages advertising but listed it in advertisements as one of advertising but listed it in advertisements as one of several NORELCO representatives.
 
 
 10
 Judge Bramwell found PBSI in contempt on January 14, 1982 and ordered sanctions. Executive Business Systems v. Philips Business Systems, 539 F.Supp. 76 (E.D.N.Y.1982). Immediately after the contempt decision, PBSI moved to modify the preliminary injunction so as to permit Executive to receive only the discount all other former IRO's and ED's were currently receiving rather than the additional discount mandated by the district court. PBSI maintained that the pre-July 1981 status quo could be continued simply by enjoining it from selling within Executive's PAR. PBSI also moved to amend its answer by asserting a counterclaim charging Executive with inducing discriminatory prices in violation of the Robinson-Patman Act. Judge Bramwell denied both motions.
 
 2. The Second Action: Carlos v. PBSI
 
 11
 In a separate action, Carlos, another former ED, sued PBSI on August 6, 1981, again in the Eastern District. Carlos claimed that PBSI's marketing change violated both the New Jersey Franchise Practices Act and the Connecticut Franchise Act, Conn.Gen.Stat.Ann. Secs. 41-133e to -133h (West Supp. 1982), and requested that PBSI be enjoined from cancelling or amending the 1978 Distributorship Agreement with regard to it. Jurisdiction was again based on diversity of citizenship.
 
 
 12
 Finding that loss of the Exclusive Distributorship would cause Carlos irreparable harm and that it was likely that PBSI had violated the New Jersey and Connecticut Franchise Acts, Judge Bramwell granted a preliminary injunction similar to the order entered in the Executive action. Carlos v. Philips Business Systems, 556 F.Supp. 769 (E.D.N.Y.1983). PBSI is prohibited from terminating or modifying the July 1, 1978 Distributorship Agreement with regard to Carlos. This court affirmed on the grounds that Judge Bramwell had not abused his discretion. Carlos v. Philips Business Systems, 742 F.2d 1432 (2d Cir.1983). We noted, but neither discussed nor resolved, the existence of a claim by PBSI that the state franchise acts, as construed, were invalid as inconsistent with the Robinson-Patman Act. Thus, Carlos, like Executive, continues to receive an additional 16.6% discount which is apparently enjoyed by no other NORELCO distributor purchasing from PBSI.
 
 
 13
 3. The Present Actions: PBSI v. Executive and Carlos
 
 
 14
 On March 28, 1983 PBSI commenced the present lawsuits against Executive and Carlos, again in the Eastern District, alleging that they were violating Sections 2(a) and (f) of the Robinson-Patman Act by inducing and receiving a discriminatory 16.6% discount. PBSI sought injunctive relief and treble damages.
 
 
 15
 Executive and Carlos moved to dismiss and for attorney's fees. Judge Bramwell granted both motions. Philips Business Systems v. Executive Business Systems, 570 F.Supp. 1343 (E.D.N.Y.1983). PBSI's actions, he stated, sought to use the Robinson-Patman Act to mount a collateral attack on the injunctions granted in the franchise cases. He believed such an action to be prohibited by the injunction bond rule which limits a suit for damages sustained because of a wrongful injunction sought in good faith to the security posted. Id. at 1347-49. Because he found the bringing of the instant cases was part of a "pattern of obdurate and obstinate behavior," id. at 1350, Judge Bramwell awarded $59,342 in attorney's fees to Executive and Carlos.
 
 
 16
 PBSI appeals from both rulings. Carlos and Executive cross appeal from the denial of attorney's fees for the effort of litigating the motion for attorney's fees.
 
 DISCUSSION
 
 17
 An action may be dismissed under Fed.R.Civ.P. 12(b)(6) when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-102, 2 L.Ed.2d 80 (1957). In the instant case, it is clear that the alleged violation of the Robinson-Patman Act consisted solely of Executive's and Carlos' successful actions for preliminary injunctions, and we agree with Judge Bramwell that an action for the full damages caused by a wrongful injunction is barred by the injunction bond rule.
 
 
 18
 Under the injunction bond rule, the remedy for injuries suffered as a result of a wrongful injunction is limited to the amount of the security bond. In re Spencer Kellogg & Sons, 52 F.2d 129 (2d Cir.) rev'd on other grounds sub nom. Spencer Kellogg & Sons v. Hicks, 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903 (1931). The rule was recently reaffirmed by us in Commerce Tankers Corp. v. National Maritime Union, 553 F.2d 793 (2d Cir.1977), and has been accepted in other circuits. Lucsik v. Board of Education, 621 F.2d 841, 842 (6th Cir.1980) (per curiam); United Motors Service v. Tropic-Aire, Inc., 57 F.2d 479 (8th Cir.1932).
 
 
 19
 Since the instant action seeks to recover treble the damages caused by the preliminary injunctions, the injunction bond rule would appear to bar it. PBSI argues, however, that Commerce Tankers creates an exception applicable to the instant case. Commerce Tankers involved a union's attempt to enforce a clause in a collective bargaining agreement prohibiting a shipowner from selling a ship unless the purchaser guaranteed to use a crew made up of members of that union. The union succeeded in obtaining a preliminary injunction preventing a proposed sale in violation of the clause, and Commerce counterclaimed, alleging that the agreement violated the Sherman Act. The injunction was later vacated, but the district court limited damages on the counterclaim to the amount of the bond under the injunction bond rule. We reversed. 553 F.2d at 800-01.
 
 
 20
 In Commerce Tankers the antitrust violation was prior to, and independent of, the preliminary injunction. Commerce Tankers could therefore have challenged the agreement under the Sherman Act at any time. Because the Sherman Act violation involved underlying conduct over and above the seeking of an injunction, namely negotiating a contract clause that constituted a group boycott against certain purchasers of vessels, we held that the injunction bond rule did not limit the damages recoverable for the Sherman Act violation. PBSI argues that, like the shipowner in Commerce Tankers, it has alleged a per se antitrust violation, and the injunction bond rule does not apply. In the instant case, however, the alleged Robinson-Patman Act violation stems entirely from the preliminary injunction issued under state law, and Commerce Tankers is therefore inapplicable. Accordingly, we affirm the district court's dismissal of the complaints insofar as they seek damages in excess of the amount of the injunction bonds.
 
 
 21
 Judge Bramwell awarded Executive and Carlos attorney's fees because he believed PBSI's Commerce Tankers claim to be a wholly meritless attempt, bordering on harassment, to reargue the preliminary injunction issues. 570 F.Supp. at 1351. We have previously held that attorney's fees may be awarded against a party that has brought meritless litigation in bad faith. Nemeroff v. Abelson, 704 F.2d 652 (2d Cir.1983). We believe that the award of fees in the present case, however, was an abuse of discretion. First, Commerce Tankers is a relatively recent case defining the limits of the injunction bond rule in an area where no direct precedent exists. Although we disagree with PBSI's view of that case, we note that some language in it supports the view that the injunction bond rule does not apply where a per se violation of the antitrust laws is alleged. See 553 F.2d at 800 ("The rule, however, does not apply to this action at law for damages arising out of a per se antitrust violation."). Moreover, Executive's and Carlos' counsel took the actions very seriously as their claim for over $59,000 for fees demonstrates.
 
 
 22
 Second, Judge Bramwell obviously viewed PBSI's underlying federal claims negatively. While we agree that the injunction bond rule bars an action based on those claims for damages in excess of the amount of the bonds, we take a much less negative view of the merits of PBSI's arguments. The state legislation, as construed, has the effect of legislating a permanent price discrimination in favor of local distributors over distributors in other states and of preventing manufacturers from making uniform changes in the methods of interstate distribution of goods. We believe this interpretation does raise a serious federal question, not addressed in our earlier decisions, as to the constitutional validity of these statutes.[2] The better course for PBSI would certainly have been to raise these issues as defenses in the distributorship actions and to press for trial rather than to pursue the speculative Commerce Tankers claim. Indeed, since the latter actions were not viable even under PBSI's theory of Commerce Tankers until the injunctions were vacated, instituting them has had the effect of extending the term of the preliminary injunctions. We conclude that, viewing this litigation as a whole, PBSI should not be charged with attorney's fees for attempting to raise colorable federal claims under Commerce Tankers rather than solely as defenses to the distributorship actions.
 
 
 23
 We therefore affirm the dismissal of the complaints, reverse the award of attorney's fees and, a fortiori, affirm on the cross-appeal. Our affirmance of the dismissal of the complaints is without prejudice to PBSI's seeking damages in the amount of any existing security should the injunctions be vacated. We also express the hope that a final disposition in the district court of the pending cases involving these parties will speedily occur.
 
 
 24
 Affirmed in part; reversed in part. No costs.
 
 
 
 [1]
 The New Jersey Statute, N.J.Stat.Ann. Sec. 56:10-5 (West Supp.1984), provides in relevant part:
 It shall be a violation of this act for any franchisor directly or indirectly ... to terminate, cancel, or fail to renew a franchise without having first given written notice setting forth all the reasons for such termination, cancellation, or intent not to renew to the franchisee at least 60 days in advance of such termination, cancellation, or failure to renew.... It shall be a violation of this act for a franchisor to terminate, cancel or fail to renew a franchise without good cause. For the purposes of this act, good cause for terminating, canceling, or failing to renew a franchise shall be limited to failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise.
 
 
 [2]
 PBSI has not yet raised the issue of whether the distributorship statutes as construed by the district court unconstitutionally discriminate against interstate commerce by compelling PBSI to give a permanent competitive advantage to local distributors over distributors in other states, see Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 350-52, 97 S.Ct. 2434, 2445-46, 53 L.Ed.2d 383 (1977) (state regulation that raises costs for another state's producers while not affecting in-state producers discriminates against interstate commerce), or unreasonably burden interstate commerce by applying differing state legislative requirements which prevent PBSI from making uniform changes in its methods of interstate distribution, see Raymond Motor Transportation v. Rice, 434 U.S. 429, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978) (truck length limits interfering with the "interlining" of interstate trailers)